Ex parte DRAYTON et al.

(District Court, D. South Carolina.   May 23, 1907.)

1. MASTER AND SERVANT—FRAUDULENT BREACH OF CONTRACT BY SERVANT.
    Cr. Code S. C. 1902, § 357, providing that any laborer working for a share of a crop, or for wages in money or other valuable consideration, under a contract to labor on farm land, who shall receive advances either in money or supplies, and thereafter willfully and without just cause fail to perform the reasonable services required of him by the terms of the contract, shall be liable to prosecution for misdemeanor and punished by imprisonment, etc., constituted an attempt to secure compulsory service in payment of a debt, which was not within the state's police power to create and punish offenses.

2. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS.
    Such section, being intended to cover agricultural laborers only, was invalid as a violation of the equality clause of the fourteenth amendment of the federal Constitution.

3. SAME—SLAVERY.
    The act also authorizes the creation of a system of peonage or involuntary servitude, in violation of the federal Constitution, Amend. 13, declaring that neither slavery nor involuntary servitude, except as punishment for crime whereof the parties have been duly convicted, shall exist within the United States or any place subject to their jurisdiction.

Petition for Writ of Habeas Corpus.

John P. Grace, for petitioners.

E. F. Cochran, U. S. Atty.

Wm. Henry Parker, for Clement.

J. Fraser Lyon, Atty. Gen., and W. St. Julien Jerrey, for the State.

BRAWLEY, District Judge.   The above-named petitioners, negroes and twin brothers, then on the chain gang in Charleston county, applied to this court for a writ of habeas corpus, and the return of the sheriff of the county, duly filed, is "that he holds the within-named Enoch Drayton and Elijah Drayton under a commitment by Magistrate T. A. Beckett, Charleston county, on a charge of violation of contract."

It appears from the transcript of the testimony taken by the stenographer of this circuit that upon the trial before the above-named magistrate, R. Lebby Clement, of Wadmalaw Island, the prosecutor, testified that in the year 1906 the two men above named made contracts with him in which they agreed to do certain farm or agricultural work, for which they received part payment; that the work was to be done in January, 1907, they being then under another contract that kept them employed for the year 1906.   Using Clement's own words:

"In January they failed to do the work.   I swore out warrants before Magistrate Beckett for violation of agricultural contract, under section 357 of the Acts of 1904."

The act of 1904 (Laws 1904, p. 428) amends section 357 of the Criminal Code of the state of South Carolina of 1902, and makes it read as follows:

"Sec. 357. Any laborer working on shares of crop or for wages in money or other valuable consideration, under a verbal or written contract to labour on

farm land, who shall receive advances either in money or supplies and thereafter wilfully and without just cause fail to perform the reasonable service required of him by the terms of the said contract, shall be liable to prosecution for a misdemeanor, provided the prosecution shall be commenced within thirty days after the alleged violation and on conviction shall be punished by imprisonment of thirty days or fined in the sum of not less than fifty dollars nor more than one hundred dollars, in the discretion of the court, provided the verbal contract herein referred to shall be witnessed by at least two disinterested witnesses, provided that such contract shall be valid only between the original parties thereto, and any attempted transfer or otherwise of any rights thereunder shall be null and void." Approved the 25th day of February A. D. 1904.

These men had been prosecuted in December, 1906, for violating a similar contract, and had served a sentence upon the chain gang for that offense. Act No. 242, p. 428, of the General Assembly of South Carolina, approved on the same day with the act above mentioned, provides that a conviction for the violation of the contract mentioned in section 357 "shall not operate as a release or discharge of such person from the performance of any part of said contract, which is to be performed subsequent to the date of the breach for which such conviction was had." The contract alleged to have been violated was not produced at the hearing, nor was there any definite testimony as to the amount due by the laborers; Clement's books of account, asked for by attorneys for petitioners, not being produced. No testimony whatever was offered as to the circumstances attending the alleged breach; the only witnesses examined being Clement, a magistrate, and one Seabrook, his constable, and the only alleged criminal act testified to was, in Clement's words, "they failed to do the work." Two affidavits of one Jacques that he had witnessed contracts between Clement and the defendants, which contracts were not offered in evidence, is about all that the record discloses which has any bearing upon the case. It thus appears that the crime for which these men were sent to the chain gang is the failure to work for Clement under contracts by which he had made certain advances to them, and they had agreed to work until the whole amount was paid.

The thirteenth amendment of the Constitution of the United States, declared ratified December 18, 1865, is as follows:

"Section 1. Neither slavery nor involuntary servitude, except as punishment for crime, whereof the parties have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

"Sec. 2. Congress shall have power to enforce this article by appropriate legislation."

The act of Congress of March 2, 1867 (14 Stat. 546, c. 187), declares that:

"Holding of any person to service or labor under the system known as peonage is hereby declared to be unlawful, and the same is hereby abolished and forever prohibited, etc., etc.; and all acts, laws, etc., of any territory or state of the United States which have heretofore established, maintained or enforced or by virtue of which any attempt shall hereafter be made to establish, maintain or enforce, directly or indirectly, the voluntary or involuntary service or labour of any person as peons, in liquidation of any debt or obligation or otherwise, be and the same are hereby declared null and void," etc.

The Supreme Court, in Clyatt v. United States, 197 U. S. 207, 25 Sup. Ct. 429, 49 L. Ed. 726, defines "peonage" as:

"A status or condition of compulsory service, based upon the indebtedness of the peon to the master. The basal fact is indebtedness. * * * That which is contemplated by the statute is compulsory service to secure the payment of a debt. * * * We entertain no doubt of the validity of this legislation or its applicability to the case of any person holding another in a state of peonage, and this whether there be municipal ordinance or state law sanctioning such holding."

The first question to be considered is whether the act of 1904, section 357 of the Criminal Code of South Carolina of 1902, is intended to secure compulsory service in payment of a debt. That appears to be its sole purpose and effect. It provides a coercive weapon to be used by the employer, and enables him to send to jail or the chain gang any person who may "fail to perform the reasonable service required of him by the terms of the said contract," and the learned Attorney General for the state, while asserting the validity of this act upon grounds hereinafter to be considered, does not contest the fact that such is its purpose and effect, and vindicates the same on the ground that such legislation is necessary owing to the peculiar conditions of agricultural labor in this state. The great body of such laborers, as is well known, are negroes, and it is claimed that, being without any financial responsibility, the ordinary remedies by judgment and execution for breaches of contract would be utterly futile. That such is the prevailing opinion is manifest in another act of the General Assembly of South Carolina, approved February 20, 1907, wherein it is provided that:

"Any person or persons who shall hereafter go into possession of any farming land of another, or shall enter into a written agreement or contract to go into possession of the farming land of another as a tenant or under a contract to farm and cultivate said land, and shall without just cause or excuse leave, desert or quit the land so leased or contracted for, shall be deemed guilty of a misdemeanor, and be fined not less than twenty-five dollars nor more than one hundred dollars, or suffer imprisonment not less than five nor more than thirty days, in the discretion of the court."

It not being contested, then, that the purpose and effect of this legislation is to secure the performance by an agricultural laborer of the personal service required by his contracts, by visiting him with pains and penalties for its violation, the next question is whether such legislation is valid under the thirteenth amendment, which forbids slavery or involuntary servitude. On behalf of the state, it is contended that such legislation is a lawful exercise of those police powers which admittedly are reserved by the states; that it is a lawful exercise of such powers to denounce as crimes the violation of such contracts; and that persons convicted thereunder are within the exception, the language of the amendment being "involuntary servitude, except as a punishment for crime." Inasmuch as it is contended by the petitioners that this legislation is also in conflict with the fourteenth amendment, in that it denies them the equal protection of the laws, being applicable only to laborers working on the farm, and is not equal and uniform, the question will be considered as affected by the two amendments named. The pertinent clauses of this amendment are as follows:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The police power is an inaccurate but convenient phrase used to designate that power inherent in every sovereignty to make laws essential to the public welfare; to promote the public health, safety, and morals; and to prevent and punish the commission of public offenses. It is incapable of exact definition or precise limitation, because of the infinite variety of circumstances affecting the relations and affairs of mankind in civilized society, where from necessity individual persons and property are subject to burdens and restraints in order to secure in a well-ordered government the general comfort, health, and prosperity of the state. Like every other power, the police power is subject to the Constitution, and cannot be used as a cloak for legislation which impairs rights or unduly restricts liberties guaranteed by it. Vast and comprehensive as is the field for the legislative exercise of the police power, it is not arbitrary or unlimited, but is fettered by the express and peremptory prohibitions of the Constitution, which is the supreme law of the land, and, wherever rights arising under that Constitution are claimed to be impaired, it is the duty of the courts to scrutinize such legislation and determine whether it really relates to the public welfare, whether it is enacted in the interest of the public generally, as distinguished from those of a class, and whether the means are reasonably necessary for the accomplishment of the public object, and not unduly oppressive on individuals, for a Legislature cannot under the guise of protecting the public interest impose unusual and unnecessary restrictions upon individual liberty or lawful occupations.

The Supreme Court, in Allgeyer v. Louisiana, 165 U. S. 589, 17 Sup. Ct. 431, 41 L. Ed. 832, in considering a statute claimed to be a violation of the fourteenth amendment, says:

"The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the employment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling"—citing similar expressions in cases previously decided.

The right of every citizen to work where he will, and for whom he he will, to select not only his employer, but his associates, to follow any of the common avocations of life, is one of those inalienable rights formulated in the Declaration of Independence, and in the Bill of Rights, which provides that "all men are possessed of equal and inalienable natural rights, among which are life, liberty and the pursuit of happiness." This is now a part of the body and letter of the organic law of the republic, and is consistent with the thought and spirit of its founders.

Judge Cooley, on Torts (page 278), says:

"It is a part of every man's civil rights that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice or malice."

And the same author, in his work on Constitutional Law (page 237), in speaking of the thirteenth amendment, says:

"It is therefore a just conclusion that any discrimination which narrows to one class, while leaving unrestricted to others the freedom of choice in em-

ployments, must be regarded as the establishment of involuntary servitude, and therefore forbidden."

The Supreme Court of the United States, in the Slaughter House Case, 16 Wall. 36, 21 L. Ed. 394, says:

"The word 'servitude' is of larger meaning than slavery, as the latter is popularly understood in this country, and the obvious purpose was to forbid all shades and conditions of African slavery. It was very well understood that in the form of apprenticeship for long terms as it has been practiced in the West India Islands, on the abolition of slavery by the English government, or by reducing slaves to the condition of serfs attached to the plantation, the purpose of the article might have been evaded, if only the word 'slavery' had been used."

And Mr. Justice Field, in his dissenting opinion in the same case, says:

"It is, however, clear that the words 'involuntary servitude' include something more than slavery in the strict sense of the term. They include also serfage, vassalage, villanage, peonage, and all other forms of compulsory service for the benefit or pleasure of others."

In the Civil Rights Case, 109 U. S. 3, 3 Sup. Ct. 18, 27 L. Ed. 835, Mr. Justice Bradley, referring to a former decision of the same court, which had considered the extent of the rights, privileges, and immunities of citizens, which cannot rightfully be abridged by state laws, says:

"A long list of burdens and disabilities of a servile character incident to feudal vassalage in France, and which were abolished by the decrees of the National Assembly, was presented for the purpose of showing that all inequalities and observances exacted by one man from another was servitude or badges of slavery which a great nation, in its effort to establish universal liberty, made haste to wipe out and destroy; but these were servitudes imposed by the old law, or by long custom which had the force of law, and exacted by one man from another without the latter's consent. Should any such servitudes be imposed by a state law, there can be no doubt that the law would be repugnant to the fourteenth amendment, no less than to the thirteenth amendment, nor any greater doubt that Congress had adequate power to forbid any such servitude from being enacted."

Mr. Tiedeman, in State and Federal Control of Persons and Property (volume 2, § 204), says:

"Every man has a natural right to hire his services to any one he pleases, or to refrain from such hiring, and so likewise it is the right of every one to determine whose services he will hire. * * * The government therefore cannot exert any restraint upon the actions of the parties."

In Ritchie v. People, 155 Ill. 98, 40 N. E. 454, 29 L. R. A. 79, 46 Am. St. Rep. 315, the court says:

"If an owner cannot be deprived of his property without due process of law, he cannot be deprived of any of the essential attributes which belong to the right of property without due process of law. Labor is property. The laborer has the same right to sell his labor and to contract with reference thereto as any other property owner. The right of property involves as one of its essential attributes the right not only to contract, but also to terminate contracts. * * * In view of what has been said, it cannot be doubted that the plaintiff in error, Charles Gillespie, had a right to terminate his contract, if he had one with Ritchie, subject to civil liability for any termination which should be unwarranted. One citizen cannot be compelled to give employment to another citizen, nor can any one be compelled to be employed against his will. The act of 1895, now under consideration, deprives the em-

ployer of the right to terminate his contract with his employé. The right to terminate such a contract is guarantied by the organic law of the state. The Legislature is forbidden to deprive the employer or employé of the exercise of that right. The Legislature had no authority to pronounce the performance of an innocent act criminal, when the public health, safety, comfort, or welfare is not interfered with. The statute in question says that, if a man exercises his constitutional right to terminate a contract with his employé, he shall upon hearing be punished as for the commission of a crime."

Adam Smith, in his Wealth of Nations (page 1, c. 10, pt. 2), says:

"The property which every one has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder him from employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property."

To compel one person to labor for another against his will is legalized thraldom. It would scarcely be contended that Clement could by force or threats compel these petitioners to work for him against their will in payment of their indebtedness. Any such attempt on his part would be a direct violation of the act of Congress of March 2, 1867, which forbids any attempt, directly or indirectly, to enforce involuntary service or labor in liquidation of any debt, and would subject him to a criminal prosecution and to the penalties denounced in that act, and the same act declares null and void the laws of any state or territory which have theretofore been enacted, or might thereafter be enacted, to enforce involuntary service or labor in liquidation of debts.

To sustain the validity of this statute, it is contended that the violation of a contract of the nature mentioned therein is a fraud; that the punishment of fraud is within the police power of the state; and that, inasmuch as the petitioners have been convicted and are serving a sentence for the offense denounced by the statute as a misdemeanor, their case falls within the exception of the thirteenth amendment, being a punishment for crime whereof the parties have been duly convicted. Much stress was laid in the argument upon an opinion of the Supreme Court of New Jersey, wherein it is said:

"I think it one of the most dishonest things a man can be guilty of to refuse to pay his honest debts, when he has the means to do so. Whatever is dishonest is fraudulent in foro conscientiæ. * * * Fraud and dishonesty are synonymous terms. * * * If he acts unjustly and unlawfully he acts fraudulently. An unjust man is a fraudulent man." Ex parte Clark, 45 Am. Dec. 396, 19 N. J. Law, 648.

And it is maintained that the failure to perform, after having received advances, etc., the reasonable service willfully and without just cause, is a malum in se, and the state has the right to penalize it in repression of fraudulent practices. It is unnecessary to consider whether a statute declaring it to be a misdemeanor to fail to pay debts, or to perform contracts generally, will fall within the general police powers of the state, for this statute is not of that character. It is directed towards a single class of citizens, which is arbitrarily singled out, and punished for failure to perform certain duties.

The Supreme Court in Gulf, etc., Railway v. Ellis, 165 U. S. 157, 17 Sup. Ct. 257, 41 L. Ed. 666, says:

"But before a distinction can be made between debtors, and one be punished for a failure to pay his debts, while another is permitted to become in like manner delinquent, without any punishment, there must be some difference in the obligation to pay, some reason why the duty of payment is more imperative in the one instance than in the other. The rule of equality is ignored. * * * Unless the Legislature may arbitrarily select one corporation or one class of corporations, one individual or one class of individuals, and visit the penalty upon them which is not imposed upon others guilty of like delinquency, this statute cannot be sustained; but arbitrary selection can never be justified by calling it classification. The equal protection demanded by the fourteenth amendment forbids this."

And elsewhere in the same opinion (page 158 of 165 U. S., page 258 of 17 Sup. Ct. [41 L. Ed. 666]), the court says:

"But a mere statute to compel the payment of indebtedness does not come within the scope of police regulations."

It will be observed that the statute nowhere declares that a laborer violating his contract shall be deemed guilty of a misdemeanor, and punished for such violation. It provides in terms that any laborer, etc., "who shall receive advances either in money or supplies and thereafter wilfully and without just cause fail to perform the reasonable service required of him by the terms of the said contract, shall be liable to prosecution for a misdemeanor." Its whole purpose is to coerce the laborer to perform the service required of him by the terms of his contract under penalty of prosecution and imprisonment if he fails to work. It is a legislative judgment enforcing involuntary servitude. It does not imprison the laborer because he refuses to pay the debt or return the advances, but because he does not continue in an involuntary servitude. Under the guise of police power, it compels one person to continue against his will to render personal services to another. If this act and others of cognate character are sustained, the state may by its criminal laws completely nullify and abrogate the main object of the amendment prohibiting slavery and involuntary servitude, and establish a complete system of peonage. That system, as it existed in New Mexico, is described by Davis, in his book, "El Gringo," as:.

"But a more charming name for a species of slavery as abject and oppressive as any found upon the American continent. * * * Among the proprietors in the country, the master generally keeps a store, where the servant is obliged to purchase every article he wants, and thus it is an easy matter to keep him always in debt. The master is required to furnish the peon with goods at the market value, and may advance him two-thirds the amount of his monthly wages; but these provisions, made for the benefit of the peon, are in most instances disregarded, and he is obliged to pay an enormous price for everything he buys, and is allowed to run in debt beyond the amount of his wages in order to prevent him leaving his master. * * * One of the most objectionable features is that the master is not obliged to maintain the peon in sickness or old age. When he becomes too old to work any longer, like an old horse who is turned out to die, he can be cast adrift to provide for himself. These are the leading features of peonage, and in spite of the new name it bears the impartial reader will not be able to make anything else out of it than slavery."

Counsel for the state attempts to distinguish this act from the Alabama statute which the Supreme Court of that state, in Toney v. State, 67 L. R. A. 286, 141 Ala. 120, 37 South. 332, 109 Am. St. Rep. 23, declared unconstitutional. That act made it a penal offense for

a person who had contracted in writing to labor for or serve another for any given time, afterwards, without the consent of the other party, and without sufficient excuse to be adjudged by the court, to leave such other party or abandon such contract or leave or abandon the leased premises or land, and to take employment of a similar nature from another person, and they attempt to draw a distinction between the words "without sufficient excuse to be adjudged by the court," and our statute, which declares it a misdemeanor "wilfully and without just cause to fail to perform the service," etc. We cannot perceive any essential distinction between the words "without sufficient excuse," and the words "without just cause."

It is also claimed by counsel that the statute of South Carolina is substantially identical with section 4730 of the Code of Alabama of 1896, which Judge Jones, in his opinion on the Peonage Cases (D. C.) 123 Fed. 690, held to be constitutional. That section is as follows:

"Any person entering into a written contract for the performance of any acts or service with intent to injure or defraud his employer and thereby obtains money or personal property from such employer and with like intent and without just cause, and without refunding the money or paying for such property, refuses to perform such act or service, must on conviction be punished as if he had stolen it."

This Alabama statute, is will be seen, is of a general nature. It applies to all persons who enter into contracts with intent to injure or defraud, and declares that persons who obtain money with such intent shall be punished as if they had stolen it. The essence of this statute is the obtaining money with fraudulent intent, which in many of the states is declared a criminal offense. The essence of the South Carolina statute is the coercing of personal service in liquidation of a debt, and the cases cited by counsel arising in the state of Georgia, where a statute somewhat similar to that of Alabama was under review, illustrate the distinction. In Lamar v. State, 47 S. E. 958, 120 Ga. 312, the court says:

"If the act prescribes a punishment for a simple failure of a contractual duty, it is beyond the power of the General Assembly; but, if its purpose is to punish for fraudulent and deceitful practices, it is valid, even though the fraud or deceit may arise from the failure to comply with the contractual engagement. The right of the lawmaking power to declare fraudulent practices a crime does not seem to have been ever seriously questioned. It is reasonably clear that, in enacting the statute now under consideration, the legislative purpose was not to punish one simply for a failure to pay a debt, but was to punish the act of securing the money or property of another with a fraudulent intent not to perform the service, the promise to do which was the consideration for such money or property."

Other cases from the same state are to the same effect. Banks v. State, 52 S. E. 74, 124 Ga. 15, 2 L. R. A. (N. S.) 1007, where Lumpkin, Justice, says:

"On the face of it, the purpose of the act is to punish fraudulent practices, not the mere failure to pay a debt. Thus considered, it was constitutional, otherwise it would not be so."

The same counsel seemed to consider a phrase of Mr. Justice Brown, in Robertson v. Baldwin, 165 U. S. 275, 17 Sup. Ct. 326, 41 L. Ed.

153 F.—63

715, as furnishing some support for their view. The passage quoted is this:

"A breach of a contract for personal service has not, however, been recognized in this country as involving the liability to criminal punishment, except in the case of sailors and soldiers, and possibly some others, nor would public opinion tolerate a statute to that effect."

And the argument is that the phrase "possibly some others," followed by the words "public opinion," indicates that the Supreme Court recognized that there might be exceptions to the general rule forbidding involuntary servitude, and that wherever public opinion tolerated such exceptions the courts are bound to recognize that public opinion as the sole tribunal for the redress of any evils complained of.

In Robertson v. Baldwin, four seamen, who had been arrested in accordance with the provisions of section 4598 of the Revised Statutes, sought their release by habeas corpus on the ground that this section was in violation of the thirteenth amendment, and the court held that this amendment was not intended to introduce any novel doctrine with respect to certain descriptions of service which had always been treated as exceptional, such as the military and naval establishments, or to disturb the rights of parents and guardians to the custody of their minor children and wards, and reviewing the history of the maritime law, and the grounds upon which it rested, says:

"From the earliest historical period, the contract of a sailor has been treated as an exceptional one, and involving to a certain extent his personal liberty during the life of the contract. Indeed, the business of navigation could scarcely be carried on without some guaranty beyond the ordinary civil remedies upon contracts that the sailor will not desert the ship at a critical moment or leave her at some place where seamen are impossible to be obtained, as Molloy forcibly expresses it, 'to rot in her neglected brine.' Such desertion might involve a long delay of the vessel, while the master is seeking another crew, and abandonment of the voyage, and in some cases the safety of the ship itself. Hence the laws of nearly all maritime nations have made provision for securing the personal attendance of the crew on board and for criminal punishment for desertion or absence without leave during the life of the shipping articles."

Counsel have with apparent seriousness attempted to maintain that the case of the petitioners here is analogous to that of sailors who had embarked on a voyage; that their continuance in the service of their employer was as essential to the safety of the crop as the service of sailors to the safety of the ship. In other words, that these men who had made a contract for service last year may be arrested and imprisoned in January, when probably there is not seed in the ground, and such arrest be vindicated by the immemorial usage which requires sailors to remain at their posts. It may be proper to say that the section of the Revised Statutes above referred to has been repealed since this opinion was filed, but the lack of analogy between the two classes is too apparent to require discussion.

The fact that there might be exceptions to the general language of the thirteenth amendment led the court to attempt to lay down some rule whereby in any given case it could be determined whether the involuntary servitude complained of falls within the inhibitions of the

Constitution, and, in answer to the question, where shall the line be drawn, the court says:

"We know of no better answer to make than to say that services which have from time immemorial been treated as exceptional shall not be regarded as within its purview."

And from the whole opinion it is clear that a breach of contract for personal services was not regarded as falling within the exception, and manifestly the "public opinion," which the learned justice said would not tolerate a statute to that effect, was the public opinion of the country at large, which had made itself manifest in the amendment to the Constitution abolishing slavery with all its badges and incidents.

Another view has been presented with much earnestness, which demands consideration; and that is: While not denying the jurisdiction or the power of the federal courts to issue habeas corpus to one alleged to be restrained of his liberty by a state court in violation of the Constitution or laws of the United States, it is contended that we are not bound to exercise this power, that it is a matter of discretion, and that the accused should be put to his writ of error from the highest court of the state. It is a question of great delicacy, for the federal courts should, and generally do, assume that a state Legislature will not willfully disregard the Constitution of the United States, and that the state courts will perform an obligatory duty and administer justice in conformity with that Constitution, and, in the absence of special and urgent circumstances, the federal courts should never allow the writ of habeas corpus to be converted into a writ of error to review the actions of any of the tribunals which the state has organized for the administration of justice. Upon any question which is fairly debatable, and especially upon questions involving merely the rights of property, this court would be very reluctant to assume jurisdiction, and to declare an act of the Legislature unconstitutional. It has this very week refused to do so, where the counsel for a great corporation, in an argument of great cogency, has impeached the validity of an act of whose constitutionality it had grave doubts; but in a question involving personal liberty, where it has no doubts, and where the circumstances are urgent, it cannot refrain, from any consideration of delicacy, from the performance of a plain duty. The petitioners in this case are of the poorest and humblest class of citizens. It would be a mockery of justice to say to them: "You must carry your appeal from this unjust judgment, first, to the circuit court, then to the Supreme Court of the state, and, if necessary, by writ of error, to the Supreme Court of the United States." Their case has been brought here by a young member of this bar, himself belonging to a race that in the past has suffered through centuries of injustice and oppression, whose heart has been touched by the cry of the lowly, and who, apparently at his own cost, from sheer love of liberty and hatred of wrong, makes this appeal for the liberty to which they are entitled under every sanction of the Constitution and laws of their country. It were better that the granite walls which support this court of justice be crumbled into dust, than that its doors be closed to such appeal.

Another argument is presented not without its force, and not without its appeal to state pride, and to those race instincts, which, doubtless, for some wise purpose, are ineradicable; and that is: That the legislation complained of is a part of a system of local administration in matters of great concern to the industrial life of the state; that under our system of local self-government the power of the state in that sphere is supreme; and that the white people of the state, now charged with the responsibility of its government, being better acquainted with the negro, his capacities and limitations, can determine better than those outside of it what policy will best subserve his interest and their own. In much of this contention the writer of this opinion fully concurs. Other men's devotion to the state may require proofs. The marks of his are written in the lead of its enemies on his person. He believes as firmly today as in his younger days that local self-government is the foundation stone upon which rests the perpetuity of this republic, and belonging by birth and by the associations of a lifetime to that class of slave owners and land holders in whose supposed interest this legislation is enacted, and in whose many virtues he has a just pride, and fully conscious of the trials and difficulties which still encompass them, and having shared the adverse fortune which overwhelmed them all in a common calamity, it is not without profound sympathy that he has looked upon every effort made to surmount the unparalleled difficulties which eviron two races so dissimilar, bound to live on the same soil and under the same laws. The question presented does not permit of brief treatment, and the problem presented is possibly beyond any human solution. The one sufficient answer to the argument is that the question of human liberty is not one of merely local concern. It rests upon the Constitution of the United States, and no duty rests more imperatively upon its courts than to be watchful of the constitutional rights of its citizens, and to construe liberally all the provisions for the security of persons and the equality of rights, which is the foundation of free government.

If time permitted, it is believed that it could be demonstrated that this legislation is as economically unwise as it is constitutionally illegal. Our state, through public appropriations and private contributions, is now actively and earnestly engaged in promoting immigration. Those efforts will be unavailing so long as our statute books hold legislation tending to create a system of forced labor, which in its essentials is as degrading as that of slavery. Desirable immigrants from foreign lands look for a land of freedom, where labor is respected and protected, and all the allurements of soil and climate will be vain to tempt them to a state where they will be in competition with forced labor. Although in its practicable application this legislation affects the negro only, in its terms it is directed against all laborers on farm lands, and constitutes a menace surely calculated to repel the coming of white men. Communities which have attained the highest degree of prosperity have no such statutes, and we may be sure that intending immigrants will have pointed out to them all such discriminating laws.

The lot of the agricultural laborer is at best a hard one. He has been called "the brother to the ox." Unceasing toil, scant remuneration, and dreary isolation have a natural tendency to drive him to more

inviting fields. Manufacturing establishments, the railroads, lumber camps, and phosphate mines drain the best laborer from the fields of agriculture, and whatever may be the remedy for existing conditions, certainly the remedy is not to be found in statutes which chain him to the soil and force him to labor, whether he will or not. Human nature revolts at it, and he will escape it if he can. It is by improving his condition, and not still further degrading it, that the remedy may be found.

The statute in question violates the thirteenth and fourteenth amendments of the Constitution of the United States, and laws made in pursuance thereof, and is null and void.

The prisoners are discharged.