TAYLOR et al. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit.   July 28, 1917.)

No. 1512.

1. CRIMINAL LAW ⬯1156(1)—CONSIDERATION OF ERROR—REFUSAL OF TRIAL COURT TO GRANT NEW TRIAL.

Though the Circuit Court of Appeals will not entertain a writ of error in a criminal case where the trial court, in its discretion, refuses to grant new trial, nevertheless, in a prosecution for conspiring to violate the laws of the United States by returning another to the condition of peonage, where it is apparent on the face of the record that error has been committed determinative of the questions involved, the court will consider the same on error though the trial court refused to grant new trial.

2. SLAVES ⬯24—STATUTE—"PEONAGE."

"Peonage," within Pen. Code 1909, § 269 (Act March 4, 1909, c. 321, 35 Stat. 1142 [Comp. St. 1916, § 10442]), providing that whoever holds, returns, or aids in the arrest or return of any person to a condition of peonage shall be fined or imprisoned, is a status or condition of compulsory service based on the indebtedness of the peon to the master.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Peonage.]

3. SLAVES ⬯24—RETURNING TO CONDITION OF PEONAGE—STATUTE.

Where defendant employed a servant for a year at $10 a month, and independently loaned him $13 to enable him to get married, and the servant, on discovering that he could not live on his wage, left the employment, and defendant, having initiated a prosecution against him under state law for so doing, declined to release the servant unless the latter paid up all he owed him, together with $25 additional for damages, and the servant paid, but defendant later procured his arrest on a magistrate's warrant, the servant being forced to work in the chain gang, neither defendant nor the magistrate placed the servant in a condition of peonage to warrant their conviction of the offense of so placing him in violation of Pen. Code 1909, § 269, the servant never having been in a condition of peonage.

4. CONSPIRACY ⬯28—RETURNING SERVANT TO CONDITION OF PEONAGE—STATUTE.

The act of a master and a magistrate in conspiring to put the master's servant in a condition of involuntary servitude through a prosecution for breach of his contract of employment, in order to require him to perform his contract to work one year for the master, was insufficient to warrant a conviction, even if their conduct resulted in placing the servant in involuntary service, under Crim. Code 1909, § 37 (Comp. St. 1916, § 10,201), denouncing the offense of conspiring to commit an offense against the United States, for having conspired to violate section 269, providing that whoever returns any person to a condition of peonage shall be fined, etc., the servant never having been in such condition, so that his master and the magistrate could not return him to it.

5. SLAVES ⬯24—STATUTE—"PEONAGE"—"DEBT."

One cannot be deemed guilty of peonage where he has held another in involuntary servitude to compel such other to comply with an agreement to work for a certain term, since an obligation to work cannot be reasonably construed to mean a "debt" as contemplated by the peonage statute (Pen. Code 1909, § 269).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Debt.]

6. CONSPIRACY ⬤⟹28—RETURN TO CONDITION OF PEONAGE—STATUTE.

   To sustain a conviction of conspiracy to return a servant to a condition of peonage, it must appear that defendants unlawfully conspired to return the servant to a condition of peonage as contemplated by Pen. Code 1909, § 269.

7. CONSPIRACY ⬤⟹28—VIOLATION OF PEONAGE ACT.

   Though a magistrate, by some agreement, express or implied, with the master of a servant being prosecuted before him under state law for breach of his contract of employment, at the time that the servant was convicted, had permitted the master to take him into custody, and thus require him to work long enough to perform his contract of employment, the magistrate would not thereby have rendered himself liable to conviction on the charge of conspiracy to violate the peonage statute (Pen. Code 1909, § 269), where at the time the servant had paid the master all the money he owed him.

   Woods, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

J. G. Taylor and Ioor Hayes were convicted of an offense, and they bring error. Reversed.

Arthur R. Young, of Charleston, S. C. (Hagood, Rivers & Young, of Charleston, S. C., and E. L. Asbill, of Leesville, S. C., on the brief), for plaintiffs in error.

Francis H. Weston, U. S. Atty., of Columbia, S. C. (J. Waties Waring, Asst. U. S. Atty., of Charleston, S. C., on the brief), for the United States.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. The defendants were indicted in the District Court of the United States for the Eastern District of South Carolina charged with a violation of sections 37 and 269 of the Penal Code of 1909. The sections in question are in the following language:

"37. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

"269. Whoever holds, arrests, returns, or causes to be held, arrested, or returned, or in any manner aids in the arrest or return of any person to a condition of peonage, shall be fined not more than five thousand dollars, or imprisoned not more than five years, or both."

The first indictment contains three counts, charging the defendants, Taylor and Hayes, with conspiring to return Cook to a condition of peonage. The second indictment contains three counts, in which the defendant Hayes is charged with violating section 269 of the Criminal Code, to wit, causing Cook to be arrested for the purpose of placing him in a condition of peonage. The third indictment also contains three counts, charging the defendant Taylor with having Cook arrested with felonious intent, for the purpose of placing Cook in a condition of peonage; that is, compelling him to work and labor for Taylor in car-

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

rying out a certain pretended contract. These indictments were consolidated at the time the defendants were placed upon trial.

Evidence was introduced to the effect that Willie Cook, a young white man, about 22 years of age, in the latter part of December, 1915, entered into an agreement with J. G. Taylor as laborer upon his farm during the year 1916, and was to receive as compensation therefor $10 per month and a house in which to live. Under this agreement Cook moved on the plantation of Taylor the latter part of 1915, where he remained until the last of February, 1916, at which time he left Taylor and went to the home of his father-in-law. Shortly thereafter Cook, accompanied by his father-in-law, returned to the home of Taylor with a view of securing his release from any further obligation on his contract, upon the ground that he found it impossible for himself and wife to live on the wages which Taylor had agreed to pay him. Cook and his father-in-law testified that they urged this view of the case to Taylor, and insisted that he relieve Cook of any further obligation under the contract. Taylor declined to grant this request unless he was paid all that Cook owed him, together with $25 additional for damages. It was shown that Cook, independent of the contract to work, owed Taylor $13. The learned judge who heard this case, referring to this phase of the testimony, said:

"According to the testimony, Taylor had, prior to Cook's making the contract for service, loaned Cook some thirteen dollars (but wholly independent of the contract), Cook stating he desired to get it in order to get married."

Cook was unable to reach an agreement with Taylor and returned to the home of his father-in-law. Taylor then conferred with the defendant Hayes, who was a magistrate, and instituted a prosecution against Cook for failing to work under his contract. Thereupon Hayes wrote the father-in-law of Cook, who, accompanied by Cook, went to see Hayes. At that time Hayes told them that Taylor must be satisfied before he could do anything, and unless the matter was adjusted with Taylor that he would at once proceed with the prosecution. Cook and his father-in-law then went to see Taylor, who again refused to allow him to stop working, and the defendant Hayes said to Cook that he must work for Taylor or go on the chain gang. Accordingly, a warrant was sworn out by Taylor against Cook, whereupon the defendant and his constable went to the house where Cook was residing, to execute the same. Finally an agreement was reached by which Cook was to plead guilty and pay the sum of $25, which was to end the matter. Cook entered a plea of guilty, and Hayes was paid $25. Cook and his father-in-law departed, thinking the matter was ended. However, a few days afterwards Hayes, under pressure from Taylor, issued a second warrant for Cook. An interview followed between Cook, his father-in-law, and Hayes, in which Hayes said that Taylor had required him to prosecute under the contract, and that Cook must either work for Taylor or work on the chain gang for the rest of the year. Cook was tried under this warrant, sent to the chain gang, put in shackles, fined, and required to work for 30 days.

It appears that a third party then intervened in the interest of Cook, who interviewed Hayes in regard to the matter, but Hayes again a-

clared that Cook must either work for Taylor the rest of the year or spend the rest of the year working on the chain gang; that the contract was a monthly one, and that he would issue a fresh warrant every month. In the meantime the attention of the United States government was directed to this condition of affairs, and Hayes and Taylor were arrested.

The defendants were tried, and the jury found them guilty, whereupon the court entered judgment, to which the defendant excepted, and the case now comes here upon a writ of error.

While it appears that plaintiff failed to enter a motion in arrest of judgment, it does appear that a motion for a new trial was made, on the ground that the evidence did not disclose any element of peonage.

[1] It is insisted by counsel for the government that this court will not entertain a writ of error where the court below refuses to grant a new trial, inasmuch as the granting or refusing of a motion of that character is within the discretion of the trial judge. This is undoubtedly the general rule. However, in a case of this importance, where it is apparent on the face of the record that an error has been committed, which is determinative of the questions involved therein, the court will consider the same.

In the case of Wiborg v. United States, 163 U. S. 632, 16 Sup. Ct. 1127, 41 L. Ed. 289, the Supreme Court said:

"No motion or request was made that the jury be instructed to find for defendants or either of them. Where an exception to a denial of such a motion or request is duly saved, it is open to the court to consider whether there is any evidence to sustain the verdict, though not to pass upon its weight or sufficiency. And although this question was not properly raised, yet if a plain error was committed in a matter so absolutely vital to defendants, we feel ourselves at liberty to correct it."

Also in the case of Clyatt v. United States, 197 U. S. 207, 25 Sup. Ct. 429, 49 L. Ed. 726, in referring to this point, the court said:

"While no motion or request was made that the jury be instructed to find for defendant, and although such a motion is the proper method of presenting the question whether there is evidence to sustain the verdict, yet Wiborg v. United States, 163 U. S. 632 [16 Sup. Ct. 1127, 1197, 41 L. Ed. 289], justifies us in examining the question in case a plain error has been committed in a matter so vital to the defendant."

Thus it will be seen that the Supreme Court has expressly affirmed the ruling of the court in the case of Wiborg, supra.

[2] In order to reach a correct conclusion as to the guilt or innocence of these defendants, it becomes necessary to ascertain the meaning of the term "peonage." In the case of Clyatt v. United States, supra, the Supreme Court affords us a clear definition of the term in the following language:

"What is peonage? It may be defined as a status or condition of compulsory service, based upon the indebtedness of the peon to the master. The basal fact is indebtedness. As said by Judge Benedict, delivering the opinion in Jaremillo v. Romero, 1 N. M. 190, 194: 'One fact existed universally; all were indebted to their masters. This was the cord by which they seemed bound to their master's service.' Upon this is based a condition of compulsory service. * * * That which is contemplated by the statute is compulsory service to secure the payment of a debt."

This definition is also approved in the cases of Bailey v. Alabama, 219 U. S. 219, 31 Sup. Ct. 145, 55 L. Ed. 191; United States v. Reynolds, 235 U. S. 133, 35 Sup. Ct. 86, 59 L. Ed. 162; Peonage Cases (D. C.) 136 Fed. 707; United States v. Clement (D. C.) 171 Fed. 974.

It clearly appears from the evidence that Cook was prosecuted because of his failure to comply with his contract, to wit, his failure to work the balance of the term for which he was employed. In referring to the conference Cook and his father-in-law had with Taylor we find the following in the evidence, which is reported in narrative form:

"At this conference Taylor positively declined to release Cook, warned Cook that if he did not voluntarily perform his work under the contract he would be compelled to, but finally said that he would release him provided he, Taylor, was paid up all that Cook owed him, together with $25.00 additional for damages. According to the testimony Taylor had, prior to Cook's making the contract for services, loaned Cook some $13.00 (but wholly independent of the contract), Cook stating he desired it in order to get married."

While it is true that at that time Taylor claimed that he had loaned Cook $13, nevertheless the learned judge who heard the case says that this amount was "wholly independent of the contract," which Taylor demanded that Cook comply with by working the balance of the time therein stipulated. What the defendants, according to the testimony, sought to have Cook do was to comply with his contract, which, as we have stated, consisted of an agreement to work for Taylor for the term of one year at $10 per month. It is significant that Taylor did not by force seek to compel Cook to render involuntary service for him. It does not appear that he detained Cook for even a moment in a condition of involuntary servitude.

[3] Under these circumstances we are of opinion that Cook was never placed in a condition of peonage by the defendant Taylor so as to warrant his conviction on those counts of the indictment which charge him with placing Cook in a condition of peonage. This is equally true as to the counts wherein it is charged that Cook was returned to a condition of peonage by the defendant Hayes. It appearing that Cook was never in a condition of peonage, it necessarily follows that an indictment could not be maintained against the defendants for returing him to a condition which never existed.

In the case of Clyatt v. United States, supra, the Supreme Court said:

"The indictment charges that the defendant did unlawfully and knowingly return one Will Gordon and one Mose Ridley to a condition of peonage, by forcibly and against the will of them, the said Will Gordon and the said Mose Ridley, * * * to work to and for Samuel M. Clyatt. Now, a 'return' implies the prior existence of some state or condition. Webster defines it 'to turn back; to go or come again to the same place or condition.' In the Standard Dictionary it is defined 'to cause to take again a former position; put, carry, or send back, as to a former place or holder.' A technical meaning in the law is thus given in Black's Law Dictionary: 'The act of a sheriff, constable, or other ministerial officer, in delivering back to the court a writ, notice, or other paper.' It was essential, therefore, under the charge in this case, to show that Gordon and Ridley had been in a condition of peonage, to which, by the act of the defendant, they were returned. We are not at liberty to transform this indictment into one charging that the defendant held them in a condition or state of peonage, or that he arrested them

with a view of placing them in such condition or state. The pleader has seen fit to charge a return to a condition of peonage. The defendant had a right to rely upon that as a charge, and to either offer testimony to show that Gordon and Ridley had never been in a condition of peonage or to rest upon the government's omission of proof of that fact."

This disposes of the second and third indictments, and leaves only the one which charges the defendants with conspiracy under section 37 of the Criminal Code. It is urged by the government that the defendants, in any event, are guilty under the counts which allege that they formed a conspiracy to return Cook to a condition of peonage.

[4] The question involved is as to whether conspiring to put Cook in a condition of involuntary servitude in order to require him to perform his contract to work one year for Taylor was sufficient (even if their conduct had resulted in placing Cook in involuntary service) to warrant their conviction under the peonage statute. We think not, for the reasons stated.

While it is not binding upon this court, it may not be amiss to call attention to the fact that the Department of Justice, after a thorough investigation of the subject, through one of its assistant attorneys general, in a report made to the Attorney General on October 10, 1907, which was later submitted to Congress by the Attorney General, clearly intimated that the scope of this statute was too narrow, and should be broadened so as to cover any and all cases where it appears that one has been held in involuntary servitude by another, the third and fourth paragraphs of the report being in the following language:

"(3) That what I think was the real intent of Congress as shown in Revised Statutes, § 1990 (Comp. St. 1916, § 3944), be made law: that is, that the definition of legal peonage be made broad enough to include the holding of persons in servitude whether in liquidation of an indebtedness 'or otherwise.'

"(4) That all doubt as to whether Revised Statutes, § 5522, concerning slavery, applies to involuntary servitude of any and every kind, be set at rest by a slight amendment."

It is obvious that it was to enable the government to successfully prosecute under the peonage statutes in cases analogous to the one at bar that these suggestions were made.

In the case of Smith et al. v. United States, 157 Fed. 721, 85 C. C. A. 353, the defendants were indicted under section 5508 of the Revised Statutes (Comp. St. 1916, § 10183), which reads as follows:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same, or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars, and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States."

In that case the defendants were convicted and the judgment was affirmed by the Circuit Court of Appeals for the Eighth Circuit upon the theory that the right of freedom from slavery or involuntary servi-

tude was granted to every citizen of the United States under the Thirteenth Amendment.

The scope of the above section is much broader in its application, being intended to prevent the placing of one in involuntary servitude by denying him a right guaranteed under the Thirteenth Amendment. Notwithstanding this section, the Attorney General, charged with the enforcement of the statutes, was of the opinion that further legislation is necessary as respects this question.

We do not wish to be understood as condoning in the slightest degree the outrageous and inhuman conduct of the defendants in their treatment of Cook. Their action was reprehensible in the highest degree, and they should, if possible, be held accountable for the same. However, if the facts in this case were sufficient to warrant the conviction of the defendants on a charge of conspiracy, it must be remembered that one of the defendants was acting as a magistrate in enforcing a statute of the state of South Carolina, which counsel for defendants insist renders him immune from indictment upon the theory that judicial officers are not to be held liable for mistakes and errors committed in the discharge of their duty. It appears that Cook was indicted at the instance of Taylor under section 492 of the Criminal Code of South Carolina, which is in the following language:

"Any person who shall contract with another to render * * * personal service of any kind, and shall thereafter fraudulently, or with malicious intent to injure his employer, fail or refuse to render such service as agreed upon, shall be deemed guilty of a misdemeanor."

It further appears from the evidence that the defendant Hayes, who, as we have stated, is a magistrate of South Carolina, told Cook that Taylor had lodged a complaint against him for a violation of the foregoing statute, and that unless he complied with the contract which he had entered into with Taylor that he would be compelled to enforce the provisions of this statute by placing him on the chain gang. It also appears that Cook, with the assistance of his friends, was enabled to raise the sum of $25 which was demanded by Taylor as damages sustained by him on account of Cook's violation of the contract.

Hayes, who was acting as the agent of Taylor at that time, demanded $25 in full settlement of all matters in controversy between Taylor and Cook. The payment of this sum to Hayes was in complete satisfaction of any and all indebtedness alleged to be due Taylor. Therefore, instead of having a case of peonage as respects that transaction, it appears that Cook under compulsion paid to Hayes, as the agent of Taylor, the full amount claimed by Taylor as damages of every nature whatsoever alleged to be due Taylor by the failure of Cook to comply with his contract. It is true it was shown that this entire amount was subsequently turned over to the county by Hayes, but such action on the part of Hayes could not affect the transaction between Cook and Hayes by which Hayes, as the agent of Taylor, accepted this money in full settlement of all claims for damages or otherwise alleged to be due Taylor on account of Cook's failure to comply with his contract.

In other words, the acceptance by Hayes of the sum of $25 was in full satisfaction of all claims that Taylor had against Cook. Therefore the disposition of the money by Hayes thereafter did not in any wise affect the right of Cook to have the same applied in satisfaction of Taylor's claim, and that this was the intention of the parties is made manifest by the evidence offered by the prosecution that "Hayes finally agreed if Mack would pay $25 for Cook that that would be an end of the matter."

Thus it will be seen that Hayes, acting as the agent of Taylor, accepted the sum of $25 in full settlement of any demands that Taylor had made upon Cook up to that time, and that thereafter Cook was not in any sense of the word indebted to Taylor for money he had borrowed or otherwise. Therefore we need not concern ourselves about anything that transpired anterior to the date of this settlement in determining the guilt or innocence of these defendants.

It is further insisted, however, that the contract required Cook to work from month to month, and that this settlement, in so far as it related to Cook's agreement to work, pertained only to one month, and subsequent thereto, to wit, five days thereafter Hayes issued another warrant against Cook for failure to work under the contract, but there is not a word of testimony to indicate that he was arrested on account of a failure to pay a debt, which shows that all the parties to the transaction recognized the fact that by the payment of the $25 there was a full and complete satisfaction not only of the demands of Taylor that Cook should work in accordance with his contract, but that it was also in full settlement of the $13 which Cook had borrowed from Taylor. The evidence as to the reason why Cook was arrested the last time is epitomized as follows:

"Five days afterwards, viz. on the 22 March, 1916, Hayes issued a second warrant against Cook for failure to work under the contract, under which second warrant Cook was arrested. Mack and Cook thereupon had another interview with Hayes, in which Hayes said to them that Mr. Taylor required him to prosecute under the contract, and that Cook must either work for Taylor or work on the chain gang; that unless he came and worked for Taylor under the contract he would have to work on the chain gang for the rest of the year. The case was then tried, Cook was found guilty of violation of the statute by refusing to work under his contract, and was fined $50 or 30 days on the chain gang, and not paying the $50 he was sent to the chain gang; put in shackles, and confined and worked with the chain gang for 30 days."

Thus it appears that Cook was arrested the last time solely on account of his failure to comply with his contract to work for Taylor.

[5] This brings us to the question as to whether one can properly be deemed guilty of peonage where he has held another in involuntary servitude for the purpose of having him comply with an agreement to work for a certain term. An obligation to work, we think, cannot be reasonably construed to mean a debt as contemplated by the peonage statute. Indeed, the definition of "peonage" in Central America and in Mexico has always been restricted to actual indebtedness—that is, where one contracts to pay another a certain sum—and this definition has been rigidly adhered to by the courts of this country in every case

that has arisen under this statute. Clyatt v. United States, supra; Bailey v. Alabama, supra; United States v. Reynolds, supra; Peonage Cases, supra; United States v. Clement, supra.

As we have stated, it is further contended by counsel for defendants that inasmuch as the defendant Hayes was a magistrate, and as such committed Cook to work upon the public roads, he could not be held accountable, either criminally or otherwise, for his actions as respects this matter; and in support of such contention the opinion of Judge Jones in what is known as the Peonage Cases (D. C.) 123 Fed. 671, is relied upon. In that case the court, among other things, said:

"The magistrate or other judicial officer who makes an error of judgment in the exercise of his jurisdiction—exceeds his authority in the sentence imposed —is not guilty of the offense of causing the party to be held in a condition of peonage, or involuntary servitude, because in consequence of such sentence the defendant is put and kept at hard labor. There must be much more than that to involve the officer in criminal responsibility. For reasons of imperative public policy, a judicial officer is not responsible, civilly, for mistakes or errors of judgment; nor is he indictable or impeachable for such. The statutes against peonage and involuntary servitude are not intended to punish officers where persons are convicted or sentenced under unconstitutional laws, or through errors or mistakes in the administration of constitutional laws, and are held, under sentence thereon, to labor by state officers, or hired, according to the requirements of law to others, who restrain the convict and compel him to perform labor against his will. Imprisonment under an unconstitutional law is of course unlawful, and civil responsibilities may attach, under certain conditions, to other than judicial officers; but a person who does no more than to bring the machinery of the law into play from proper motives, or sits in judgment, or executes the sentence, is not criminally responsible, under the statutes, for holding or causing the party to be held to 'a condition of peonage' or involuntary servitude. The wisest and best men differ as to the constitutionality of laws, and the highest courts frequently overrule or depart from their own decisions, and constantly reverse the judgments of lower courts. There would be little independence or safety on the part of those who expound or execute the laws, if criminal responsibilities attached to honest errors or mistakes of judgment."

It is insisted, however, by counsel for the government that the evidence shows that Hayes willfully and corruptly entered into a conspiracy with Taylor to return Cook to a condition of involuntary servitude, and that, therefore, he is not entitled to the protection which is thrown around an officer in the discharge of his duty when he does no more than enforce the law, even if such law be unconstitutional. Even if this contention be true, these defendants cannot properly be convicted of a conspiracy to return Cook to a condition of peonage.

[6] In order to sustain a conviction in this instance, it must appear that the defendants unlawfully conspired to return Cook to a condition of peonage as contemplated by the statute. While it may be said that they were working in concert for the purpose of having Cook comply with his contract, this, as we have already stated, does not render the defendants guilty of the offense for which they are indicted, even if they had gone so far as to compel Cook to render compulsory service in pursuance of his contract. At most he was indicted under a state statute, and, because of his failure to comply with his contract, was placed upon the chain gang and required to render service there which

inured to the benefit of the state, and by which Taylor was not benefited in the least so far as the record shows.

While the evidence, we think, warrants the inference that Hayes acted in concert with Taylor in his efforts to have Cook comply with his contract, it does not appear that Hayes aided Taylor in placing Cook in a condition of servitude, and for the reasons hereinbefore stated Hayes could not be indicted for attempting to return Cook to a condition of servitude—a condition which never existed. All Hayes did was to fine Cook, and upon his failure to pay the same sentenced him to a term upon the chain gang, which in no sense of the word could be construed as requiring Cook to comply with his contract.

[7] Even if by some agreement, express or implied, at the time that Cook was convicted Hayes had permitted Taylor to take Cook into custody and thus require him to work a sufficient length of time to perform his contract, Hayes would not have thereby rendered himself liable to conviction on the charge of conspiracy as alleged in the indictment, inasmuch as it clearly appears that at that time Cook had paid every cent of the money that he owed Taylor. In the Peonage Cases, supra, Judge Jones, in referring to what is necessary to warrant a conviction of a judicial officer under the peonage statute, said:

"On the other hand, where a magistrate or other judicial officer corruptly exercises his functions in order that a citizen may be convicted unlawfully and sentenced, so that a particular person, with whom he has an understanding, express or implied by becoming the surety on confession of judgment, may get the custody of the convict, or make a profit out of a contract to be made between the convict and his surety, in consequence of which the convict is detained and put to hard labor, such magistrate or other judicial officer cannot escape criminal responsibility to the United States for the conspiracy, and its natural and designed result, in the holding of a citizen in a condition of peonage or involuntary servitude, because the judicial officer has taken the precaution to veil his wrong in the form of an official act."

There is nothing in the record to show, as we have stated, that Hayes, by indirection or otherwise, enabled Taylor to require Cook to comply with his contract by rendering involuntary service, nor is there anything to show that Hayes made any profit in pursuance of any agreement that he entered into with Taylor.

We are therefore of opinion that this case is wholly lacking in the essential elements necessary to render Hayes and Taylor guilty as charged in the first indictment.

For the reasons stated, the judgment of the court below should be reversed.

WOODS, Circuit Judge (dissenting). The seriousness of the issues to a large class of unintelligent laborers seems to justify a statement of the reasoning on which I think it clear the judgment of the District Court should be affirmed.

The defendant J. G. Taylor, a farmer, and Ioor Hayes, a magistrate, were indicted jointly for conspiracy under section 37 of the Criminal Code, and separately for violation of section 269 relating to peonage. The cases were tried together by consent, and there was a general

verdict of guilty. The evidence and the course of the trial are thus set out in the record:

Willie Cook, a young man of 22 years of age, and just married, made the following written agreement with the defendant J. G. Taylor:

" 'State of South Carolina, Lexington County.

" 'This agreement witnesseth: That Wm. Cook binds and obligates himself to labor during the year 1916, beginning January 1st, 1916, and to labor continuously until December 31st, 1916, upon the farm and elsewhere as may be directed, for and under and by the direction of J. G. Taylor. To do and perform all labor wherever ordered of whatever kind so instructed by the said J. G. Taylor to do. And in consideration of such services given, the said J. G. Taylor shall pay to the said Wm. Cook ten and no/100 dollars each month, of the twelve months.

" 'This done and witnesseth this December 27, 1915.

" 'William Cook,
" 'J. G. Taylor.

" 'Witness: Matthew Taylor,
" 'F. H. Hendrix.'

"After his marriage he moved to a house on the plantation of J. G. Taylor, which was furnished him by Taylor for himself and his wife to live in. He lived on the place and worked for Taylor, under Taylor's commands, from about the 1st of January, 1916, to the 26 or the 28 February, 1916, when, without saying anything to Taylor, his wife and himself left the house and walked to his father-in-law's, one J. C. Mack, about twelve miles away. Cook stated that up to the time of his leaving he had worked for Taylor voluntarily. He talked the matter over with his father-in-law, and a day or so afterwards his father-in-law and himself came together to see Taylor to ask Taylor to let Cook off from any further working on his contract, it being stated to Taylor that Cook found it impossible to support himself and his wife upon the agreed payment to be made to him under the terms of the contract. At this conference Taylor positively declined to release Cook, warned Cook that if he did not voluntarily perform his work under the contract he would be compelled to, but finally said that he would release him, provided he (Taylor) was paid up all that Cook owed him, together with $25 additional for damages. According to the testimony, Taylor had, prior to Cook's making the contract for services, loaned Cook some $13 (but wholly independent of the contract), Cook stating that he desired it in order to get married. Cook and his father-in-law, Mack, then returned to the latter's house, Cook refusing to return to Taylor's for work, and subsequently they received a letter from the defendant Ioor Hayes, who was a magistrate, to the effect that he was about to institute a prosecution against Cook for failing to work under his contract, and wanted a day for trial fixed. Cook and his father-in-law, Mack, then went to see Hayes, the magistrate, who, however, refused to do otherwise than say that if they wanted to settle the matter they must fix it up with Taylor; that he had nothing to do with it, and that if Taylor required him he must proceed with the prosecution, but that they must fix it up with Taylor. In accordance with this, Mack and Cook again went to see Taylor, and had a conversation with Taylor in which Taylor refused to allow Cook to stop working for him, and said that unless Cook returned and went on with his work for Taylor he would prosecute him, and put him on the chain gang; that he either should work for Taylor or he should work on the chain gang. After this Cook never worked for Taylor, but returned with Mack to the latter's house, and remained there, and shortly afterwards the defendant Hayes, the magistrate, with his constable, came to the house for the purpose of arresting Cook; and there Hayes had an interview with Mack and Cook, in which, according to the testimony for the prosecution, Hayes finally agreed that if Mack would pay the sum of $25 for Cook, that that would be an end of the matter, but if it was not paid he would have to prosecute him and put him on the chain gang. Mack did not have as much as $25, but he had $13, and Mack wrote a note to his landlord asking him to add the additional amount to make it $25, and send it to Hayes, which he did,

and the money was received by Hayes on the 17th of March, 1916. Hayes then wrote upon the warrant in that case that the defendant had pleaded guilty and a fine of $25 had been imposed and was paid, which amount Hayes turned over to the county treasurer. Five days afterwards, viz. on the 22 March, 1916, Hayes issued a second warrant against Cook for failure to work under the contract, under which second warrant Cook was arrested. Mack and Cook thereupon had another interview with Hayes, in which Hayes said to them that Mr. Taylor required him to prosecute under the contract, and that Cook must either work for Taylor or work on the chain gang; that unless Cook came and worked for Taylor under the contract he would have to work on the chain gang for the rest of the year. The case was then tried, Cook was found guilty of violation of the statute by refusing to work under his contract, and he was fined $50 or 30 days on the chain gang, and, not paying the $50, he was sent to the chain gang, put in shackles, and confined and worked with the chain gang for 30 days. In the meantime one Langford, being acquainted with Mack and hearing of Cook, and having an interest in the latter's misfortunes, busied himself to see if he could not get Cook released from his confinement on the chain gang, and he went also and had an interview with Hayes, when Hayes told him that there was no way of settling the matter except by Cook's working for Taylor, that Taylor was continually pressing him to punish Cook, and that Cook must either work for Taylor for the rest of the year, or he would have to spend the rest of the year working on the chain gang; that the contract was a monthly one, and that he would issue a fresh warrant every month and had other warrants against Cook. After the charge of the judge to the jury upon this and other testimony in the cause, the jury found the defendants guilty. No exceptions were made to either the testimony or the judge's charge. After sentence a motion was made for a new trial upon the ground that under the statute there must be a return to a condition of peonage; in other words, that the party charged could not be guilty unless there had first been involuntary or compelled service performed and the party performing it had ceased performing it and steps were taken to compel the return to a state of involuntary servitude; that in this case Cook appears to have worked voluntarily for Taylor until he left Taylor's employment, there having been no compulsion shown prior to that time, and that the only conspiracy or compulsion shown by the testimony was the compulsion or conspiracy to compel him to return to Taylor's service, which prior to that time had been voluntary, and therefore was not compulsion to compel him to return to a state of involuntary service to which he never did return; and that, taking a conspiracy to have been established, it was not a conspiracy to commit crime. "The motion for a new trial was refused, and the defendants duly excepted to the refusal to grant them a new trial."

The statutes involved provide as follows:

"Sec. 269. Whoever holds, arrests, returns, or causes to be held, arrested, or returned, or in any manner aids in the arrest or return of any person to a condition of peonage, shall be fined not more than five thousand dollars, or imprisoned not more than five years, or both."

"Sec. 37. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

Cook was never actually in a condition of peonage; that is, working under compulsion for Taylor in discharge of a debt. An expression in Clyatt v. United States, 197 U. S. 207, 216, 25 Sup. Ct. 429, 49 L. Ed. 726, might possibly be construed as an intimation that the crime is complete when an arrest is made for the purpose of placing one in a condition of peonage without actually accomplishing the purpose. But the point was not involved nor decided, and we are free to hold oth-

erwise. It seems clear that the peonage statutes do not make criminal an arrest with the purpose of placing a man in a condition of peonage without the actual accomplishment of the purpose. The crime denounced is in fact holding one in a condition of peonage, or returning one to a condition of peonage, or by means of arrest placing one in a condition of peonage, who may or may not have been a peon before. Since the arrest did not result in making Cook a peon or returning him to the condition of a peon, neither of the defendants could be convicted under the separate indictments against them under section 269 on the mere proof that they had him arrested for the purpose of compelling him to become a peon.

The conviction must, therefore, stand or fall on the indictment for conspiracy. The offense is complete, under section 37, whenever a conspiracy is formed to place a man in a condition of peonage and any single act is done in pursuance of the design, although the plan completely fails of accomplishment.

The argument is earnestly pressed that the indictment charges a conspiracy to return Cook to a condition of peonage, and hence the defendants could not properly be convicted under proof of a conspiracy to make him a peon by means of arrest when he had not before been one. The argument is technically plausible, but unsound in substance. The sole purpose of an indictment is to acquaint the defendant with the charge he is expected to meet. Here there is excessive verbiage, and the use of the words "return to a condition of peonage" was inappropriate in describing the purpose of the conspiracy proved; but in making the charge definite, and specifying what was meant by returning to a condition of peonage, the indictment charges that the conspiracy was—

"for the purpose of returning the said Willie Cook to a condition of peonage; that is to say, for the purpose of returning the said Willie Cook to a condition of peonage by then and there compelling and requiring him, the said Willie Cook, to serve and labor and work for the said J. G. Taylor against the will of him, the said Willie Cook, in liquidation of a certain debt, then and there claimed by the said J. G. Taylor, to be due and owing him, the said J. G. Taylor, by the said Willie Cook."

Thus the defendants were fully advised that they were charged with conspiring to compel Cook to work for Taylor in payment of a debt by means of his arrest, and that they had actually had him arrested for that purpose. The indictment is thus distinguished from that found unsustained by the proof in Clyatt v. United States, supra.

The facts agreed on carry on their face conclusive proof of a combination or agreement between Taylor and Hayes to arrest Cook and by means of the arrest to force him to labor for Taylor. Taylor's purpose was evident. Hayes' conduct and statements showed that he had an understanding with Taylor to pervert his official power to that end. Casting off his judicial character, he became the agent of Taylor in enforcing his demands on Cook, and, without trial or judicial hearing, he openly declared that Cook must either work for Taylor according to his demand, or he would have to spend the remainder of the year on the chain gang. The arm of the law would be weak indeed

if a magistrate could be allowed to shield himself from the consequences of such willful oppression on the pretense that he was acting in a judicial capacity. There was no exception to the charge of the District Judge, and, even if there had been room for doubt that Hayes was willfully perverting his judicial office for purposes of oppression in the interest of Taylor, it must be assumed that the issue was properly submitted to the jury. No error is assigned except the refusal of the motion for a new trial. In the grounds of the motion there is no claim whatever that the proof was insufficient to show that Hayes was perverting his judicial office to private ends, or that there was any lack of evidence to prove the corrupt combination between Taylor and Hayes, or that there was any error in the charge. Nor was there any claim in the District Court or at the argument here that the evidence was not sufficient to show that Hayes and Taylor, in pursuance of this corrupt combination, and acting in conjunction, threatened Cook with service on the chain gang, and twice had him arrested as a means of forcing him to labor for Taylor against his will. The case is therefore before us with the conspiracy to accomplish this nefarious purpose and the overt acts of threats and arrest in pursuance of it established by the verdict of the jury supported by plenary proof under a proper charge.

It is argued, however, that there was no proof of a debt or obligation in payment of which the service was to be exacted; and as the presence of a debt is an essential element of peonage, the defendants could not be guilty of a conspiracy to arrest Cook and thereby make him Taylor's peon. The evidence is conclusive that Taylor did assert a debt against Cook, and that it was in part at least an account of the existence of a debt that the defendants entered into a conspiracy to compel Cook to work for Taylor. When Cook left Taylor's employment the relation of master and servant was at an end, but he owed Taylor $13 for money lent. The evidence shows that when Taylor commenced proceedings, his claims against Cook which he undertook to enforce by requiring Cook to labor for him for the remainder of the year were: First, Cook's obligation to work expressed in the contract; second, the debt of $13; and, third, damages sustained by reason of Cook's breach of contract.

The first overt act of the defendants was a demand made on Cook that he should work for Taylor or he would be sentenced to the chain gang. While it does not appear that anything was then said about the debt, that its payment was to be exacted from Cook's enforced service is a fair inference from the circumstances, and also from the fact that when Cook refused to enter Taylor's service the demand was made for his payment of the debt of $13 and $25 damages on pain of sentence to service on the chain gang. Taylor's grasping character and his oppressive action leave no room for doubt that he intended to exact from Cook the last farthing. At the least the inference of the jury was reasonable that one of the purposes of the conspiracy was to force Cook to labor for Taylor and pay these debts from his labor. Obviously it could make no difference that the debt of $13 was contracted before Cook entered Taylor's service.

The inference being reasonable from the evidence that enforcement of the payment of the debts was one of the purposes of the conspiracy, as soon as the defendants took the first step in its execution by threatening Cook with arrest and punishment, and having him arrested and put on the chain gang, the crime of conspiracy, under section 37, was complete, although Cook, in fear of the threats, actually paid the money demanded and the purpose of the conspiracy was never effectuated by making Cook the peon of Taylor.