## POLLOCK *v.* WILLIAMS, SHERIFF.

No. 345. Argued February 10, 1944.—Decided April 10, 1944.

*Mr. Raymer F. Maguire,* with whom *Messrs. W. H. Poe* and *Thomas T. Purdom* were on the brief, for appellant.

*Mr. John C. Wynn,* Assistant Attorney General of Florida, with whom *Messrs. J. Tom Watson,* Attorney General, and *Woodrow M. Melvin,* Assistant Attorney General, were on the brief, for appellee.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Appellant Pollock questions the validity of a statute of the State of Florida making it a misdemeanor to induce advances with intent to defraud by a promise to perform labor and further making failure to perform labor for which money has been obtained *prima facie* evidence of intent to defraud.[1] It conflicts, he says, with the Thirteenth Amendment to the Federal Constitution and with the antipeonage statute enacted by Congress thereunder. Claims also are made under the due process and equal

---

[1] The Florida statute under which Pollock is held was enacted as Chapter 7917 of the Acts of 1919. It was re-enacted as §§ 817.09 and 817.10, Statutes of 1941, in the revision and compilation of the general statute laws of the State. It reads:

"817.09 Obtaining property by fraudulent promise to perform labor or service.—Any person in this state who shall, with intent to injure and defraud, under and by reason of a contract or promise to perform labor or service, procure or obtain money or other thing of value as a credit, or as advances, shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding six months.

"817.10 Same; prima facie evidence of fraudulent intent.—In all prosecutions for a violation of § 817.09 the failure or refusal, without just cause, to perform such labor or service or to pay for the money or other thing of value so obtained or procured shall be prima facie evidence of the intent to injure and defraud."

6

protection clauses of the Fourteenth Amendment which we find it unnecessary to consider.

Pollock was arrested January 5, 1943, on a warrant issued three days before which charged that on the 17th of October, 1942, he did "with intent to injure and defraud under and by reason of a contract and promise to perform labor and service, procure and obtain money, to-wit: the sum of $5.00, as advances from one J. V. O'Albora, a corporation, contrary to the statute in such cases made and provided, and against the peace and dignity of the State of Florida." He was taken before the county judge on the same day, entered a plea of guilty, and was sentenced to pay a fine of $100 and in default to serve sixty days in the county jail. He was immediately committed.

On January 11, 1943, a writ of habeas corpus was issued by the judge of the circuit court, directed to the jail keeper, who is appellee here. Petition for the writ challenged the constitutionality of the statutes under which Pollock was confined and set forth that "at the trial aforesaid, he was not told that he was entitled to counsel, and that counsel would be provided for him if he wished, and he did not know that he had such right. Petitioner was without funds and unable to employ counsel. He further avers that he did not understand the nature of the charge against him, but understood that if he owed any money to his prior employer and had quit his employment without paying the same, he was guilty, which facts he admitted." The Sheriff's return makes no denial of these allegations, but merely sets forth that he holds the prisoner by virtue of the commitment "based upon the judgment and conviction as set forth in the petition." The Supreme Court of Florida has said that "undenied allegations of the petition are taken as true." [2]

---

[2] State ex rel. Libtz v. Coleman, 149 Fla. 28, 5 So. 2d 60.

The Circuit Court held the statutes under which the case was prosecuted to be unconstitutional and discharged the prisoner. The Supreme Court of Florida reversed.[3] It read our decisions in *Bailey* v. *Alabama*[4] and *Taylor* v. *Georgia*[5] to hold that similar laws are not in conflict with the Constitution in so far as they denounce the crime, but only in declaring the *prima facie* evidence rule. It stated that its first impression was that the entire Florida act would fall, as did that of Georgia, but on reflection it concluded that our decisions were called forth by operation of the presumption, and did not condemn the substantive part of the statute where the presumption was not brought into play. As the prisoner had pleaded guilty, the Florida court thought the presumption had played no part in this case, and therefore remanded the prisoner to custody. An appeal to this Court was taken and probable jurisdiction noted.[6]

Florida advances no argument that the presumption section of this statute is constitutional, nor could it plausibly do so in view of our decisions. It contends, however, (1) that we can give no consideration to the presumption section because it was not in fact brought into play in the case, by reason of the plea of guilty; (2) that so severed the section denouncing the crime is constitutional.

I.

These issues emerge from an historical background against which the Florida legislation in question must be appraised.

The Thirteenth Amendment to the Federal Constitution, made in 1865, declares that involuntary servitude

---

[3] *Williams* v. *Pollock,* 153 Fla. 338, 14 So. 2d 700.

[4] 219 U. S. 219.

[5] 315 U. S. 25.

[6] October 25, 1943.

shall not exist within the United States and gives Congress power to enforce the article by appropriate legislation.[7] Congress on March 2, 1867, enacted that all laws or usages of any state "by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise," are null and void, and denounced it as a crime to hold, arrest, or return a person to the condition of peonage.[8] Congress thus raised both a shield and a sword against forced labor because of debt.

*Clyatt* v. *United States* was a case from Florida in which the Federal Act was used as a sword and an employer

---

[7] "Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

"Section 2. Congress shall have power to enforce this article by appropriate legislation."

[8] The Act of March 2, 1867, 14 Stat. 546, reads:

"The holding of any person to service or labor under the system known as peonage is hereby declared to be unlawful, and the same is hereby abolished and forever prohibited in the Territory of New Mexico, or in any other Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of the Territory of New Mexico, or of any other Territory or State of the United States, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, be, and the same are hereby, declared null and void; and any person or persons who shall hold, arrest, or return, or cause to be held, arrested, or returned, or in any manner aid in the arrest or return of any person or persons to a condition of peonage, shall, upon conviction, be punished by fine not less than one thousand nor more than five thousand dollars, or by imprisonment not less than one nor more than five years, or both, at the discretion of the court." The first part of the statute is now 8 U. S. C. § 56 (R. S. § 1990) and the criminal provision is § 269 of the Criminal Code, 18 U. S. C. § 444 (R. S. § 5526).

convicted under it. This Court sustained it as constitutional and said of peonage: "It may be defined as a status or condition of compulsory service, based upon the indebtedness of the peon to the master. The basal fact is indebtedness. . . . Peonage is sometimes classified as voluntary or involuntary, but this implies simply a difference in the mode of origin, but none in the character of the servitude. The one exists where the debtor voluntarily contracts to enter the service of his creditor. The other is forced upon the debtor by some provision of law. . . . A clear distinction exists between peonage and the voluntary performance of labor or rendering of services in payment of a debt. In the latter case the debtor, though contracting to pay his indebtedness by labor or service, and subject like any other contractor to an action for damages for breach of that contract, can elect at any time to break it, and no law or force compels performance or a continuance of the service." [9]

Then came the twice-considered case of *Bailey* v. *Alabama*,[10] in which the Act and the Constitution were raised as a shield against conviction of a laborer under an Alabama act substantially the same as the one before us now. Bailey, a Negro, had obtained $15 from a corporation on a written agreement to work for a year at $12 per month, $10.75 to be paid him and $1.25 per month to apply on his debt. In about a month he quit. He was convicted, fined $30, or in default sentenced to hard labor for 20 days in lieu of the fine and 116 days on account of costs. The Court considered that the portion of the state law defining the crime would require proof of intent to defraud, and so did not strike down that part; nor was it expressly sustained, nor was it necessarily reached, for the *prima facie* evidence provision had been used to obtain a conviction.

[9] 197 U. S. 207, 215–16 (1905).

[10] 211 U. S. 452 (1908), where held to be brought here prematurely, and 219 U. S. 219 (1911).

This Court held the presumption, in such a context, to be unconstitutional.

Later came *United States* v. *Reynolds* and *United States* v. *Broughton* [11] in which the Act of 1867 was sword again. Reynolds and Broughton were indicted under it. The Alabama Code authorized one under some circumstances to become surety for a convict, pay his fine, and be reimbursed by labor. Reynolds and Broughton each got himself a convict to work out fines and costs as a farm hand at $6.00 per month. After a time each convict refused to labor further and, under the statute, each was convicted for the refusal. This Court said, "Thus, under pain of recurring prosecutions, the convict may be kept at labor, to satisfy the demands of his employer." It held the Alabama statute unconstitutional and employers under it subject to prosecution.

In *Taylor* v. *Georgia* [12] the Federal Act was again applied as a shield, against conviction by resort to the presumption, of a Negro laborer, under a Georgia statute in effect like the one before us now. We made no effort to separate valid from invalid elements in the statute, although the substantive and procedural provisions were, as here, in separate, and separately numbered, sections. We said, "We think that the sections of the Georgia Code upon which this conviction rests are repugnant to the Thirteenth Amendment and to the Act of 1867, and that the conviction must therefore be reversed." Only recently in a case from Northern Florida a creditor-employer was indicted under the Federal Act for arresting a debtor to peonage, and we sustained the indictment. *United States* v. *Gaskin.* [13]

These cases decided by this Court under the Act of 1867 came either from Florida or one of the adjoining states.

[11] 235 U. S. 133 (1914).
[12] 315 U. S. 25 (1942).
[13] 320 U. S. 527.

And these were but a part of the stir caused by the Federal Antipeonage Act and its enforcement in this same region.[14] This is not to intimate that this section, more than others, was sympathetic with peonage, for this evil has never had general approval anywhere, and its sporadic appearances have been neither sectional nor racial. It is mentioned, however, to indicate that the Legislature of Florida acted with almost certain knowledge in designing its successive "labor fraud" acts in relation to our series of peonage decisions. The present Act is the latest of a lineage, in which its antecedents were obviously associated with the practice of peonage. This history throws some light on whether the present state act is one "by virtue of which any attempt shall hereafter be made" to "enforce involuntary servitude," in which event the Federal Act declares it void.

In 1891, the Legislature created an offense of two elements: obtaining money or property upon a false promise to perform service, and abandonment of service without just cause and without restitution of what had been obtained.[15] In 1905, this Court decided *Clyatt* v. *United States,* indicating that any person, including public officers,

---

[14] See *Peonage Cases,* 123 F. 671; *United States* v. *Eberhart,* 127 F. 252; *United States* v. *McClellan,* 127 F. 971; *In re Peonage Charge,* 138 F. 686; *Ex parte Drayton,* 153 F. 986; *Taylor* v. *United States,* 244 F. 321.

[15] "Any person in the State of Florida, who by false promises and with the intent to injure or defraud, obtains from another, any money or personal property, or any person who has entered into a written contract, with, at the time, the intent to defraud, to do or to perform any act or service, and in consideration thereof, obtains from the hirer, money or other personal property, and who abandons the service of said hirer without just cause, without first re-paying such money or paying for such personal property, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be punished by a fine not less than five nor more than five hundred dollars, or by imprisonment in the county jail not less than thirty days, nor more than one year, or both fine and imprisonment." Florida Laws 1891, c. 4032.

**12**

even if acting under state law, might be guilty of violating the Federal Act. In 1907, the Florida Legislature enacted a new statute, nearly identical in terms with that of Alabama.[16] In 1911, in *Bailey* v. *Alabama,* this Court held such an act unconstitutional. In 1913, the Florida Legislature repealed the 1907 act, but re-enacted in substance the section denouncing the crime, omitting the presumption of intent from the failure to perform the service or make restitution.[17] In 1919, the Florida Supreme Court

---

[16] It provided:

"Section 1. That from and after the passage of this act any person in the State of Florida, who shall contract with another to perform for him services of any kind with intent to procure money, or other thing of value thereby, and not to perform the service contracted for, or whoever, after having so contracted, shall obtain or procure from the hirer money or other thing of value, with intent not to perform such service, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by fine of not more than one thousand dollars or by imprisonment in the county jail not more than one year, or by both fine and imprisonment.

"Sec. 2. That satisfactory proof of the contract, the procuring thereon of money or other thing of value, the failure to perform the services so contracted for, or failure to return the money so advanced with interest thereon at the time said labor or service was to be performed, without good and sufficient cause, shall be deemed prima facie evidence of the intent referred to in the preceding section." Florida Laws 1907, c. 5678.

[17] "Section 1. Any person in this State who shall contract with another to perform any labor or service and who shall, by reason of such contract and with the intent to injure and defraud, obtain or procure money or other thing of value as a credit or advances from the person so contracted with and who shall, without just cause, fail or refuse to perform such labor or service or fail or refuse to pay for the money or other thing of value so received upon demand, shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine not exceeding five hundred dollars or by imprisonment for a period not exceeding six months.

"Sec. 2. That Chapter 5678, Acts of 1907, be and the same is hereby repealed.

"Sec. 3. That all laws in conflict with the provisions of this Act are hereby repealed." Florida Laws 1913, c. 6528.

held this act, standing alone, void under the authority of *Bailey* v. *Alabama*.[18] Whereupon, at the session of 1919, the present statute was enacted, including the *prima facie* evidence provisions, notwithstanding these decisions by the Supreme Court of Florida and by this Court. The Supreme Court of Florida later upheld a conviction under this statute on a plea of guilty, but declined to pass on the presumption section, because, as in the present case, the plea of guilty was thought to make its consideration unnecessary.[19] The statute was re-enacted without substantial change in 1941. Again in 1943 it was re-enacted despite the fact that the year before we held a very similar Georgia statute unconstitutional in its entirety.[20]

## II.

The State contends that we must exclude the *prima facie* evidence provision from consideration because in fact it played no part in producing this conviction. Such was the holding of the State Supreme Court. We are not concluded by that holding, however, but under the circumstances are authorized to make an independent determination.[21]

---

[18] *Goode* v. *Nelson*, 73 Fla. 29, 74 So. 17. "As 'involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted,' is forbidden 'within the United States' by the Federal Constitution, a crime to be punished by imprisonment cannot lawfully be predicated upon the breach of a promise to perform labor or service." 73 Fla. at 32.

[19] *Phillips* v. *Bell*, 84 Fla. 225, 94 So. 699. In this case no reference was made to the prior decision of the Florida court in *Goode* v. *Nelson*, *supra* note 18.

[20] Florida Statutes (1941) §§ 817.09, 817.10; Florida Laws 1943, c. 22000, approved June 10, 1943. *Taylor* v. *Georgia* was decided January 12, 1942. 315 U. S. 25.

[21] "That the question is one of fact does not relieve us of the duty to determine whether in truth a federal right has been denied. When a federal right has been specially set up and claimed in a state court, it is our province to inquire not merely whether it was denied in

14

What the prisoner actually did that constituted the crime cannot be gleaned from the record. The charge is cast in the words of the statute and is largely a conclusion. It affords no information except that Pollock obtained $5 from a corporation in connection with a promise to work which he failed to perform, and that his doing so was fraudulent. If the conclusion that the prisoner acted with intent to defraud rests on facts and not on the *prima facie* evidence provisions of the statute, none are stated in the warrant or appear in the record. None were so set forth that he could deny them. He obtained the money on the 14th of October, 1942, and the warrant was not sought until January 2, 1943. Whether the original advancement was more or less than $5, what he represented or promised in obtaining it, whether he worked a time and quit, or whether he never began work at all are undisclosed. About all that appears is that he obtained an advancement of $5 from a corporation and failed to keep his agreement to work it out. He admitted those facts and the law purported to supply the element of intent. He admitted the conclusion of guilt which the statute

express terms but also whether it was denied in substance and effect. If this requires an examination of evidence, that examination must be made. Otherwise, review by this Court would fail of its purpose in safeguarding constitutional rights. Thus, whenever a conclusion of law of a state court as to a federal right and findings of fact are so intermingled that the latter control the former, it is incumbent upon us to analyze the facts in order that the appropriate enforcement of the federal right may be assured." *Norris* v. *Alabama,* 294 U. S. 587, 589. See *Lisenba* v. *California,* 314 U. S. 219, 236; *Chambers* v. *Florida,* 309 U. S. 227. "Even though the constitutional protection invoked be denied on non-federal grounds, it is the province of this Court to inquire whether the decision of the state court rests upon a fair or substantial basis. If unsubstantial, constitutional obligations may not be thus evaded." *Broad River Power Co.* v. *South Carolina,* 281 U. S. 537, 540; *Demorest* v. *City Bank Farmers Trust Co.,* 321 U. S. 36.

made *prima facie* thereon. He was fined $20 for each dollar of his debt, and in default of payment was required to atone for it by serving time at the rate of less than 9¢ per day.

Especially in view of the undenied assertions in Pollock's petition we cannot doubt that the presumption provision had a coercive effect in producing the plea of guilty. The statute laid its undivided weight upon him. The legislature had not even included a separability clause.[22] Of course the function of the *prima facie* evidence section is to make it possible to convict where proof of guilt is lacking. No one questions that we clearly have held that such a presumption is prohibited by the Constitution and the federal statute. The Florida Legislature has enacted and twice re-enacted it since we so held. We cannot assume it was doing an idle thing. Since the presumption was known to be unconstitutional and of no use in a contested case, the only explanation we can find for its persistent appearance in the statute is its extra-legal coercive effect in suppressing defenses. It confronted this defendant. There was every probability that a law so recently and repeatedly enacted by the legislature would be followed by the trial court, whose judge was not required to be a lawyer. The possibility of obtaining relief by appeal was not bright, as the event proved, for Pollock had to come all the way to this Court and was required, and quite regularly, to post a supersedeas bond of $500, a hundred times the amount of his debt. He was an illiterate Negro laborer in the toils of the law for the want of $5. Such considerations bear importantly on the decision of a prisoner even if aided by counsel, as Pollock was not, whether to plead guilty and hope for leniency or to fight. It is plain that, had his plight after conviction

---

[22] The Florida Legislature has made use of separability clauses where separability was the desire. See Florida Laws 1919, cc. 7808, 7936.

not aroused outside help, Pollock himself would have been unheard in any appellate court.

In the light of its history, there is no reason to believe that the law was generally used or especially useful merely to punish deceit. Florida has a general and comprehensive statute making it a crime to obtain money or property by false pretenses [23] or commit "gross fraud or cheat at common law." [24] These appear to authorize prosecution for even the petty amount involved here.[25] We can conceive reasons, even if unconstitutional ones, which might lead well-intentioned persons to apply this Act as a means to make otherwise shiftless men work,[26] but if in addition to this general fraud protection employers as a class are so susceptible to imposition that they need extra legislation, or workmen so crafty and subtle as to constitute a special menace, we do not know it, nor are we advised of such facts.

We think that a state which maintains such a law in face of the court decisions we have recited may not be heard to say that a plea of guilty under the circumstances is not due to pressure of its statutory threat to convict him on the presumption.

As we have seen, Florida persisted in putting upon its statute books a provision creating a presumption of fraud

[23] Florida Statutes (1941) § 817.01.

[24] Florida Statutes (1941) § 817.29.

[25] These statutes carry permissible maximum punishment such, however, that they may be prosecuted only in courts presided over by judges required to be lawyers and where presumably defendant's rights are more accurately observed. See Florida Constitution, Art. V, §§ 3, 17; Florida Statutes (1941) §§ 32.05, 33.03, 36.01.

[26] Dr. Albert Bushnell Hart in The Southern South, after reviewing and unsparingly condemning evidences of peonage in some regions, says, "Much of the peonage is simply a desperate attempt to make men earn their living. The trouble is that nobody is wise enough to invent a method of compelling specific performance of a labor contract which shall not carry with it the principle of bondage." P. 287.

from the mere nonperformance of a contract for labor service three times after the courts ruled that such a provision violates the prohibition against peonage. To attach no meaning to such action, to say that legally speaking there was no such legislation, is to be blind to fact. Since the Florida Legislature deemed these repeated enactments to be important, we take the Legislature at its own word. Such a provision is on the statute books for those who are arrested for the crime, and it is on the statute books for us in considering the practical meaning of what Florida has done.

In the view we take of the purpose and effect of this *prima facie* evidence provision it is not material whether as matter of state law it is regarded as an independent and severable provision.

### III.

We are induced by the evident misunderstanding of our decisions by the Florida Supreme Court, in what we are convinced was a conscientious and painstaking study of them, to make more explicit the basis of constitutional invalidity of this type of statute.

The undoubted aim of the Thirteenth Amendment as implemented by the Antipeonage Act was not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States. Forced labor in some special circumstances may be consistent with the general basic system of free labor. For example, forced labor has been sustained as a means of punishing crime,[27] and there are duties such as work on

---

[27] *United States* v. *Reynolds*, 235 U. S. 133, 149; *Loeb* v. *Jennings*, 133 Ga. 796, 67 S. E. 101, affirmed on other grounds, 219 U. S. 582; *Dunbar* v. *Atlanta*, 7 Ga. App. 434, 67 S. E. 107. Cf. *Chicago* v. *Williams*, 254 Ill. 360, 98 N. E. 666; *Chicago* v. *Coleman*, 254 Ill. 338, 98 N. E. 521.

highways[28] which society may compel. But in general the defense against oppressive hours, pay, working conditions, or treatment is the right to change employers. When the master can compel and the laborer cannot escape the obligation to go on, there is no power below to redress and no incentive above to relieve a harsh overlordship or unwholesome conditions of work. Resulting depression of working conditions and living standards affects not only the laborer under the system, but every other with whom his labor comes in competition. Whatever of social value there may be, and of course it is great, in enforcing contracts and collection of debts, Congress has put it beyond debate that no indebtedness warrants a suspension of the right to be free from compulsory service. This congressional policy means that no state can make the quitting of work any component of a crime, or make criminal sanctions available for holding unwilling persons to labor. The federal statutory test is a practical inquiry into the utilization of an act as well as its mere form and terms.

Where peonage has existed in the United States it has done so chiefly by virtue of laws like the statute in question. Whether the statute did or did not include the presumption seems to have made little difference in its practical effect. In 1910, in response to a resolution of the House of Representatives, the Immigration Commission reported the results of an investigation of peonage among immigrants in the United States.[29] It found that no general system of peonage existed, and that sentiment did not support it anywhere. On the other hand, it found sporadic cases of probable peonage in every state in the Union except Oklahoma and Connecticut. It pointed out that "there has probably existed in Maine the most com-

[28] *Butler* v. *Perry,* 240 U. S. 328.

[29] Report on Peonage, Abstracts of Reports of the Immigration Commission, Vol. II, p. 439, Sen. Doc. No. 747, 61st Cong., 3d Sess.

plete system of peonage in the entire country," in the lumber camps.[30] In 1907, Maine enacted a statute, applicable only to lumber operations but in its terms very like the section of the Florida statute we are asked to sep-

[30] The operation of the system is described as follows:

"In late years the natives who formerly supplied the labor for the logging concerns in that State have been engaged in the paper mills, and the lumber companies have been compelled to import laborers, largely foreigners, from other States. Boston is the chief labor market for the Maine forests. The employment agents misrepresent conditions in the woods, and frequently tell the laborers that the camps will be but a few miles from some town where they can go from time to time for recreation and enjoyment. Arriving at the outskirts of civilization the laborers are driven in wagons a short distance into the forests and then have to walk sometimes 60 or 70 miles into the interior, the roads being impassable for vehicles. The men will then be kept in the heart of the forest for months throughout the winter, living in a most rugged fashion and with no recreation whatever. A great many of them have rebelled against this treatment, and they have left their employers by the score. The lumbermen having advanced transportation and supplies have appealed to the legislature for protection. In February, 1907, a bill became a law making it a crime for a person to—

enter into an agreement to labor for any lumbering operation or in driving logs and in consideration thereof receive any advances of goods, money, or transportation, and unreasonably and with intent to defraud, fail to enter into said employment as agreed and labor a sufficient length of time to reimburse his employer for said advances and expenses.

Judges in municipal courts and trial justices were given jurisdiction to try cases under this law, and the act provided that it would take effect immediately upon approval. When this bill was before the legislature, requests were made by citizens interested in factories and other industries that the provisions of the statute be made to protect all employers of labor. The attorney who introduced the bill on behalf of the lumber interests which he represented, has stated that he had refused to accede to these requests, inasmuch as he believed the provision should not be extended. The protection granted by the statute, therefore, was restricted to a favored class, persons interested in 'lumbering operations and in driving logs.' " Peonage Report, *supra* note 29, p. 447.

arate and save. The law was enforcible in local courts not of record. The Commission pointed out that the Maine statute, unlike that of Minnesota [31] and the statutes of other states in the West and South, did not contain a *prima facie* evidence provision. But as a practical matter the statute led to the same result.[32]

---

[31] Minnesota Stat. (1941) § 620.64.

[32] "There is no provision in the Maine statute that—

the failure or refusal of any employee to perform such labor or render such services in accordance with his contract or to pay in money the amount for such transportation or such advancement shall be prima facie evidence of his intent to defraud;

as appears in the contract-labor law of Minnesota and in the statutes of other States in the West and the South. However, justices of the peace in Maine have decided indiscriminately that, in order to obtain a conviction under the law of that State, it is necessary to show only that the laborer obtained the 'advances' and failed 'to labor a sufficient length of time to reimburse his employer.'

"A justice at Houlton, Maine, who is a lawyer by profession, told the attorney representing the peonage committee that he decided in cases brought under the contract-labor law that 'the burden of proof is upon the defendant,' who must show to the court 'beyond a reasonable doubt that he had no intent to defraud.' This justice added that once in a while if a laborer has a really good excuse he will let him off, as he believes 'every man has some rights, although he may be poor.' Another justice of the peace at Patten, Maine, stated that if it was shown that a laborer had obtained the advances and had not worked sufficiently to settle for them he found the defendant guilty without considering the question of intent to defraud. This seems to be the general attitude of the rural justices of Maine toward the contract-labor law.

"Considerable peonage has resulted from this statute. The law has been vigorously enforced. Soon after its passage prosecutions were commenced in the lumber regions, and the jail at Dover, the county seat of one of the large lumber counties of Maine, was crowded with laborers convicted of defrauding their employers out of 'advances of goods, money, or transportation.'

"Involuntary servitude results in utilizing this statute to intimidate laborers to work against their will. On account of the vigorous methods pursued in enforcing the above-described law, it soon became

The fraud which such statutes purport to penalize is not the concealment or misrepresentation of existing facts, such as financial condition, ownership of assets, or data relevant to credit. They either penalize promissory representations which relate to future action and conduct or they penalize a misrepresentation of the present intent or state of mind of the laborer.[33] In these "a hair perhaps divides the false and true." Of course there might be provable fraud even in such matters. One might engage for the same period to several employers, collecting an advance from each, or he might work the same trick of hiring out and collecting in advance again and again, or otherwise provide proof that fraud was his

known throughout the lumber region of Maine that any laborer was liable to imprisonment who refused to work according to the provisions of his contract until he had settled for all advances, no matter what misrepresentations may have been made to induce him to enter into the agreement. The contract-labor law has become a club which the foremen and superintendents draw upon the laborers who refuse to go to work or to continue at work. If a man leaves his employer before settling for advances, he will be pursued and apprehended, or someone will telephone to the constable, who will arrest the laborer. He will then be brought before the justice, and 'sent down the river,' to prison; or if he consents to labor until he shall have reimbursed for all advances and the fine and cost of the prosecution, the employer will settle with the court and constable and will take the laborer back into the forest. No doubt many of the laborers never attempt to escape, although they may consider that they have been basely deceived about the conditions of labor." Peonage Report, *supra* note 29, pp. 448–49.

[33] The Court at one time said, "The law gives a different effect to a representation of existing facts, from that given to a representation of facts to come into existence. To make a false representation the subject of an indictment, or of an action, two things are generally necessary, viz., that it should be a statement likely to impose upon one exercising common prudence and caution, and that it should be the statement of an existing fact. A promissory statement is not, ordinarily, the subject either of an indictment or of an action." *Sawyer* v. *Prickett*, 19 Wall. 146, 160.

Page 22 header

design and purpose. But in not one of the cases to come before this Court under the antipeonage statute has there been evidence of such subtlety or design. In each there was the same story, a necessitous and illiterate laborer, an agreement to work for a small wage, a trifling advance, a breach of contract to work. In not one has there been proof from which we fairly could say whether the Negro never intended to work out the advance, or quit because of some real or fancied grievance, or just got tired. If such statutes have ever on even one occasion been put to a worthier use in the records of any state court, it has not been called to our attention. If this is the visible record, it is hardly to be assumed that the off-the-record uses are more benign.

It is a mistake to believe that in dealing with statutes of this type we have held the presumption section to be the only source of invalidity. On the contrary, the substantive section has contributed largely to the conclusion of unconstitutionality of the presumption section. The latter in a different context might not be invalid. Indeed, we have sustained the power of the state to enact an almost identical presumption of fraud, but in transactions that did not involve involuntary labor to discharge a debt. *James-Dickinson Farm Mortgage Co.* v. *Harry.*[34] Absent this feature any objection to *prima facie* evidence or presumption statutes of the state can arise only under the Fourteenth Amendment, rather than under the Thirteenth. In deciding peonage cases under the latter this Court has been as careful to point out the broad power of the state to create presumptions as it has to point out its power to punish frauds. It "has frequently recognized the general power of every legislature to prescribe the evidence which shall be received, and the effect of that evidence in the courts of its own government. In the exercise of this

[34] 273 U. S. 119.

power numerous statutes have been enacted providing that proof of one fact shall be *prima facie* evidence of the main fact in issue; and where the inference is not purely arbitrary and there is a rational relation between the two facts, and the accused is not deprived of a proper opportunity to submit all the facts bearing upon the issue, it has been held that such statutes do not violate the requirements of due process of law." *Bailey* v. *Alabama.*[35] But the Court added that "the State may not in this way interfere with matters withdrawn from its authority by the Federal Constitution or subject an accused to conviction for conduct which it is powerless to proscribe." [36] And it proceeded to hold that the presumption, when coupled with the other section, transgressed those limits, for while it appeared to punish fraud the inevitable effect of the law was to punish failure to perform labor contracts.

In *Taylor* v. *Georgia* both sections of the Act were held unconstitutional. There the State relied on the presumption to convict. But it was not denied that a state has power reasonably to prescribe the *prima facie* inferences to be drawn from circumstantial evidence. It was the substance of the crime to establish which the presumption was invoked that gave a forbidden aspect to that method of short-cutting the road to conviction. The decision striking down both sections was not, as the Supreme Court of Florida thought, a casual and unconsidered use of the plural. Mr. Justice Byrnes knew whereof he spoke; unconstitutionality inhered in the substantive quite as much as in the procedural section and no part of the invalid statute could be separated to be salvaged. Where in the same substantive context the State threatens by statute to convict on a presumption, its inherent coercive power is such that we are constrained to hold that it is equally use-

[35] 219 U. S. 219, 238.
[36] 219 U. S. 219, 239.

24

ful in attempts to enforce involuntary service in discharge of a debt, and the whole is invalid.

It is true that in each opinion dealing with statutes of this type this Court has expressly recognized the right of the state to punish fraud, even in matters of this kind, by statutes which do not either in form or in operation lend themselves to sheltering the practice of peonage. Deceit is not put beyond the power of the state because the cheat is a laborer nor because the device for swindling is an agreement to labor. But when the state undertakes to deal with this specialized form of fraud, it must respect the constitutional and statutory command that it may not make failure to labor in discharge of a debt any part of a crime. It may not directly or indirectly command involuntary servitude, even if it was voluntarily contracted for.

From what we have said about the practical considerations which are relevant to the inquiry whether any particular state act conflicts with the Antipeonage Act of 1867 because it is one by which "any attempt shall hereafter be made to establish, maintain or enforce" the prohibited servitude, it is apparent that we should not pass on hypothetical acts. Reservation of the question of the validity of an act unassociated with a presumption now, as heretofore, does not denote approval. The Supreme Court of Florida has held such an act standing alone unconstitutional.[37] A considerable recorded experience would merit examination in relation to any specific labor fraud act.[38] We do not enter upon the inquiry further than the Act before us.

[37] *Goode* v. *Nelson, supra* note 18.

[38] On the practical effect of such laws as amounting to the existence of involuntary servitude in the United States, see: Peonage, Encyclopedia of Social Sciences; Commons & Andrews, Principles of Labor Legislation, p. 37; Wilson, Forced Labor in the United States, Chapters VI and VII; "Report of Chas. W. Russell, Assistant Attorney General, Relative to Peonage Matters," in Report of Attorney General (1937) p. 207; and Report of Immigration Commission, *supra* note 29.

Another matter deserves notice. In *Bailey* v. *Alabama* it was observed that the law of that state did not permit the prisoner to testify to his uncommunicated intent, which handicapped him in meeting the presumption. In *Taylor* v. *Georgia* the prisoner could not be sworn, but could and did make a statement to the jury. In this Florida case appellee is under neither disability, but is at liberty to offer his sworn word as against presumptions. These distinctions we think are without consequence. As Mr. Justice Byrnes said in *Taylor* v. *Georgia*, the effect of this disability "was simply to accentuate the harshness of an otherwise invalid statute."

We impute to the Legislature no intention to oppress, but we are compelled to hold that the Florida Act of 1919 as brought forward on the statutes as §§ 817.09 and 817.10 of the Statutes of 1941 are, by virtue of the Thirteenth Amendment and the Antipeonage Act of the United States, null and void. The judgment of the court below is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE REED, dissenting:

The Thirteenth Amendment to the Constitution of the United States reads as follows:

"Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

"Section 2. Congress shall have power to enforce this article by appropriate legislation."

To meet the problem of peonage, that is, "compulsory service in payment of a debt," [1] Congress enacted the legislation set out in note 8 of the Court's opinion which de-

---

[1] *Bailey* v. *Alabama*, 219 U. S. 219, 242.

clared invalid laws of a state by virtue of which involuntary service is enforced or attempted to be enforced in liquidation of any debt. This Court reiterates today in accordance with its previous rulings that the second section of the Florida statute, § 817.10 set out in note 1 of today's opinion, is invalid under the Thirteenth Amendment and the Federal Act because this second section enforces labor by fear of conviction of the crime denounced in the first section. The second section provides that a refusal to perform labor for which one has contracted and been paid in advance is prima facie evidence of an intent to defraud under the first section which makes it a crime to obtain money with intent to defraud under a contract to perform labor. This conclusion is accepted as a proper interpretation of the Federal prohibitions. In the effort to obliterate compulsory labor to satisfy a debt, Congress may invalidate a state law which coerces that labor by fear of a conviction obtained by a presumption of law which may be false in fact. *Taylor* v. *Georgia,* 315 U. S. 25.

However much peonage may offend our susceptibilities, and however great our distaste for a statute which is capable of use as a means of imposing peonage on the working man, the present statute is, in this Court, no more immune than any other which a state may enact, from the salutary requirement that its constitutionality must be presumed, and that the burden rests on him who assails it, on constitutional grounds, to show that it is either unconstitutional on its face or that it has been or will be in fact so applied as to deny his constitutional rights.

This Court now holds, as it has held before, that when the presumption section is applied in the trial of a criminal charge under the substantive section, both are invalid and a conviction thus obtained by resort to a presumption of law which may be false in fact, cannot be sustained. But the Court's opinion fails to bridge the gap between

these earlier decisions of the Court and its present conclusion that the substantive provision, when resorted to alone as the basis for a sentence on an admission of guilt, is likewise invalid, because of the mere existence of the presumption section.

Whether this conclusion rests upon the ground that the State of Florida cannot constitutionally make it a penal offense for a laborer fraudulently to procure advances of wages for which he intends to render no service or upon the ground that the presumption section has in fact operated in this case to coerce petitioner's plea of guilty, the one is plainly without support in law and the other is without support in the record.

So far as the decision of the Court rests on the ground that the substantive section is unconstitutional on its face, the decision necessarily proceeds on the assumption that because of the Thirteenth Amendment a state is without power to punish a workman who fraudulently procures an advance of a wage when he intends not to work for it, or that the two sections in law and in fact are inseparable in their application so that the substantive section is tainted by the presumption section, although in this case it is not shown to have influenced the plea of guilty.

We are given no constitutional reason for saying that a state may not punish the fraudulent procurement of an advance of wages as well as the giving of a check drawn on a bank account in which there are no funds, or any other course of conduct which the common law has long recognized, as the procuring of money or property by fraud or deceit. There is of course no constitutional reason why Florida should not punish fraud in labor contracts differently from fraud in other classes of contracts. Legislation need not seek to correct every abuse by a single enactment. The state may select its objective. *Whitney* v. *California,* 274 U. S. 357, 370; *Tigner* v. *Texas,* 310 U. S.

**141, 149.**  The Constitution does not require that all persons should be treated alike but only that those in the same class shall receive equal treatment.

Not only has the Supreme Court of Florida held as a matter of law that the two sections of the statute now before us are separable,[2] but it is obvious that as a matter of law the presumption section is not called into operation where, as here, the accused does not go to trial but pleads guilty to the substantive charge.  In rejecting these conclusions as to the separability of the two sections, we take it that the Court is not rejecting the Supreme Court of Florida's interpretation of the Florida statute, but rather that it concludes as a matter of fact that the presumption section is so all-pervasive in its operation that we must

---

[2] The Supreme Court of Florida said: "This is not the first challenge of the act which has appeared in this court.  The identical matter was considered in *Phillips* v. *Bell*, 84 Fla. 225, 94 So. 699, where the court concluded that the portion of the law defining the crime was harmonious with the Thirteenth Amendment, and observed, without deciding the point, that if the part referring to the prima facie character of certain evidence should be pronounced unconstitutional the ruling would not affect the remainder."

The court then took up *Bailey* v. *Alabama*, 211 U. S. 452, and noted as to it: "We think it very significant that the court remarked upon the lack of doubt that the offenses defined could be made a crime. Gist of the decision, as we understand it, was, summarizing, that the part of the law describing the crime and the one providing for the presumption were not interdependent and that if, in the prosecution, the state did not resort to the latter the validity of the former would be unaffected."

Later, speaking of our opinion in the *Taylor* case, the Florida court said: "The section anent presumptive evidence had been relied upon to secure a conviction, so the court again had for determination the question of the constitutionality of the first section when the second was brought into play.  Not being faced with that problem here we conclude that the first Bailey decision and ours in *Phillips* v. *Bell* are in accord and that they in turn are not in conflict with the rulings in the second Bailey case and *Taylor* v. *Georgia, supra.*"

conclude without further proof that it so operated in petitioner's case as to coerce his plea of guilty to the charge of violating the substantive section.

But neither the present record nor any facts of which we can take judicial notice lend support to that conclusion. For all that appears petitioner had no defense to the charge even though the substantive section had stood alone. Unless we are to presume that the statute can only be given an unconstitutional application, we cannot say that petitioner had any defense to the charge of fraud to which he pleaded guilty, and certainly we cannot treat the presumption section as depriving him of a defense which he did not have.

The Court apparently concludes that the enactment and maintenance of the presumption section, after a determination here of its invalidity, makes the entire statute invalid on its face. This result is reached by assuming that the existence of the presumption section coerces involuntary labor under the contract by fear of conviction for violation of the first or substantive section. We cannot properly take judicial notice of such an effect. If pleaded and proven a different situation would emerge.

The petition for habeas corpus in this case can hardly be said to go farther than object to conviction on the ground of the unconstitutionality of the Florida statute as a whole. No coercion to plead guilty is alleged. The statements in the petition as to lack of counsel and of knowledge of the elements of the offense are referred to in the Court's opinion but we do not understand that the Court relies upon them. No use was made of the presumption section at the trial. Petitioner pleaded guilty to the substantive crime. No allegations or proof appear in the record that the Florida statute was used or applied to promote peonage or involuntary servitude of petitioner or to coerce his plea of guilty. The decision is in effect that

because the two sections standing together are capable of being used in violation of the Thirteenth Amendment and the peonage act, each must be taken to be invalid on its face. The presumption of constitutionality of statutes is a safeguard wisely conceived to keep courts within constitutional bounds in the exercise of their extraordinary power of judicial review. It should not be disregarded here.

We cannot conclude that a statute which merely punishes a fraud in a contract, as the first section does if considered alone, violates the provision of the Thirteenth Amendment against involuntary servitude or is null and void under 8 U. S. C. § 56 because it is an attempt to enforce compulsory service for a debt. Conviction under the statute results not in peonage, work for a debt, but in punishment for crime, probably in the county workhouse. Cf. *United States* v. *Reynolds,* 235 U. S. 133, 149. The conception embodied in the Court's opinion that the fear of conviction for his fraud might compel the defendant to work as agreed is without basis in the record. At any rate, fear of punishment is supposed to be a deterrent to crime.

The conviction should be affirmed.

The CHIEF JUSTICE joins in this dissent.