[Crim. No. 6003. June 30, 1982. Fifth Dist.]

In re ETHAN A. JENNINGS, JR., on Habeas Corpus.

**Counsel**

James B. Maguire III, Public Defender, under appointment by the Court of Appeal, for Petitioner.

James B. Lindholm, Jr., County Counsel, and David K. Hughes, Deputy County Counsel, for Respondent.

Wendt, Mitchell & de la Motte and Melvin A. de la Motte, Jr., for Real Party in Interest.

---

OPINION

**HANSON (P. D.), J.**—■ ■■■ ■ Ethan A. Jennings, Jr. (hereafter Ethan), seeks relief by petition for writ of habeas corpus (Pen. Code, § 1474) from a judgment of the San Luis Obispo County Superior Court imposing a jail term for contempt of court for failure to pay spousal support and attorney's fees.[1]

Ethan was the respondent in a San Luis Obispo County action for dissolution of marriage; real party in interest is Joann K. Jennings (hereafter Joann), his former wife and the petitioner in the divorce action below; respondent is the San Luis Obispo County Superior Court.

The petition alleges that Ethan was found in contempt of court and sentenced to 60 days in jail "despite proof that he has no ability to pay spousal support," that the order is in excess of the court's jurisdiction because it constitutes imprisonment for a debt he cannot pay and violates petitioner's rights under the California and United States Constitutions.

A declaration of petitioner's appointed counsel, James B. Maguire III, San Luis Obispo County Public Defender, alleges that the evidence at trial established that Ethan was unemployed and without assets, and that the contempt order was based upon a finding that Ethan "had the ability to earn $80,000.00 per year, not that he had any actual earnings . . . ."[2]

---

[1] While a decision of contempt is not appealable (Code Civ. Proc. §§ 904.1, subd. (a), and 1222), the judgment may be attacked by writ, and review by habeas corpus is available if the contemner is imprisoned or otherwise restrained of his liberty. (Pen. Code, § 1473; *In re Buckley* (1973) 10 Cal.3d 237, 259 [110 Cal.Rptr. 121, 514 P.2d 1201, 68 A.L.R.3d 248].)

[2] We recognize that cases have held that "'. . . spousal support . . . orders, and orders for necessary attorney's fees . . . may be enforced by contempt proceedings. These matters are not considered debts within the constitutional guaranty against imprisonment for debt.'" (*Tilghman* v. *Superior Court* (1974) 40 Cal.App.3d 599, 612 [115 Cal.Rptr. 195]; *In re Hendricks* (1970) 5 Cal.App.3d 793, 796 [85 Cal.Rptr. 220]; 2 Cal Family Lawyer (Cont.Ed.Bar 1963) § 30.55, p. 1425.)

Pending hearing on the petition, this court issued a stay order as to counts II through XIV.[3] Joann filed opposition, alleging that Ethan was convicted beyond a reasonable doubt in each count and denying that the judgment violated Ethan's rights under the state or federal Constitution or that the trial court acted in excess of its jurisdiction. Real party further alleged that: "Evidence was presented in the contempt trial showing that Mr. JENNINGS had funds to pay support and paid none. Additionally, evidence was presented in court *by Mr. JENNINGS himself* indicating that he could have earned even more money to pay support and willfully and intentionally failed to accept employment in violation of his fiduciary duty to pay support to his ex-spouse."

At the request of this court, respondent San Luis Obispo County Superior Court and petitioner filed briefs addressing whether the findings that petitioner had the ability to pay spousal support and attorney's fees were grounded upon his ability to earn money, and if so, whether the contempt adjudications were lawful under *Ex parte Todd* (1897) 119 Cal. 57 [50 P. 1071] and *In re Brown* (1955) 136 Cal.App.2d 40 [288 P.2d 27]; petitioner lodged with the court a transcript of the contempt hearing.

The record shows that an interlocutory decree of dissolution of the marriage of Ethan and Joann was entered on July 2, 1980, and a final decree on September 16, 1980. At Joann's request, the trial court took judicial notice of its previous orders and decisions in the underlying divorce action as follows: (1) On August 8, 1980, after a hearing, Ethan was ordered by respondent court to pay Joann $1,500 per month spousal support, payable the first day of each month, commencing August 1, 1980. (2) On April 27, 1981, a final "judgment after trial" was filed which restated the order for $1,500 per month spousal support. (3) Ethan was present and/or had notice of each of the above orders of the court. The April 27, 1981, judgment provides in part that Ethan pay Joann's counsel, Wendt, Mitchell & de la Motte, the sum of $12,000 as attorney's fees and costs.

---

[3]The record shows that Ethan was found guilty of 15 counts of contempt, counts II through XVI as charged. Count I was dismissed at the request of counsel for Joann at the time of trial. Counts XV to XVI concern matters other than failure to pay money and have not been attacked in this proceeding. At issue are counts II to XIII, involving findings of willful failure to pay spousal support of $1,500 per month for the 12 months of November 1980 through October 1981, and count XIV, concerning failure to pay attorney's fees.

Also entered in evidence at Joann's request was a stipulation of the parties which provides: "If Charles Davidson of 90 E. Gish Road, Suite 3A, San Jose, California, were duly called and sworn, he would testify as follows:

"1. He (Charles Davidson) loaned $3000.00 to ETHAN A. JENNINGS, JR. in March of 1981.

"2. He (Charles Davidson) loaned $1500.00 to ETHAN A. JENNINGS, JR. in June of 1981.

"3. There were no "strings attached" to the above-mentioned loans and Respondent, ETHAN A. JENNINGS, JR. was free to spend the money as he pleased.

"4. He (Charles Davidson) was told by ETHAN A. JENNINGS, JR. that the $3000.00 mentioned above was needed by Respondent for "eating money" and the $1500.00 mentioned above was needed by Respondent to spend on the wedding of his daughter, Jeri Jennings."

Joann testified at the contempt hearing that Ethan paid no part of the ordered spousal support from November 1980 through October 1981. Joann's attorney, Melvin de la Motte, testified that no portion of the $12,000 attorney's fees awarded had been paid by Ethan.

Stephen Royce Trauth testified that, acting on behalf of the appointed receiver, David Y. Farmer, and following the trial court's orders in the April 27, 1981, judgment, he took possession of the community property of the parties, including the business property of petitioner's architectural firm and sold the property[4] at auction.

Petitioner had been self-employed as an architect, but was not working at the time of the order of support of August 8, 1980. Ethan testified at the contempt hearing that the business property and most of his personal property was sold at auction by the receiver, and that he had neither income nor further assets to be sold to make the monthly spousal support payments of $1,500.[5] From approximately January

---

[4]Several items, subject of counts XV and XVI at the contempt trial, were not included; however, at oral argument it was agreed that these items had been delivered to the receiver except for some draperies which have not been found.

[5]The April 27, 1980, judgment dividing the property of the parties, judicially noticed by the court below, provided generally as follows: (1) the business interests and certain

1981 through June 1981, Ethan received unemployment insurance compensation of $120 per week. Petitioner acknowledged receiving two personal loans from Charles Davidson as recited in the above stipulation; Ethan said the money was spent for room, board, stamps and fuel costs. Ethan's expenses for room and board during the first six months of 1981 were approximately $300 per month; at the time of trial, he estimated that these expenses, including utilities, amounted to $500 per month.

The record shows that Ethan received substantial financial assistance on two other occasions. In October 1980, before the period covered by the current contempt proceeding, Ethan was ordered jailed on three counts of contempt; Lillian Root posted $1,500 on Ethan's behalf to obtain his release. Ethan testified that he felt obligated to repay this loan, but did not have the money. In October 1981, $2,800 was posted on Ethan's behalf with the court reporter for preparation of a record on appeal; Ethan said that he thought this money, posted by his attorney, came from Joann's father.

Ethan also testified that after the judgment of April 27, 1981, he tried to obtain employment in his field by sending out resumes and contacting prospective clients, customers and employers. Two file folders containing letters of application for employment and letters of rejection from prospective employers were introduced into evidence. Petitioner was not successful in his jobseeking efforts. Ethan said that he incurred telephone expenses of as much as $200 per month in pursuing job opportunities, and a friend, Lillian Root, permitted him to use her gasoline credit card to travel to interviews, an expense of approximately $150 per month. Ethan testified that he was heavily in debt, that his business owed approximately $12,000, and that his personal and tax debts amounted to $15,000 to $18,000 and $14,000, respectively.

---

other property of the parties, valued at $243,556, were awarded to Ethan, who also received a reimbursement credit of $59,659; (2) to equalize the division of property, Ethan was ordered to pay Joann $90,448; (3) the appointed receiver was directed to sell all of the business and other property, pay certain community debts, and divide any remaining proceeds between the parties, except that the amount awarded Ethan was to be used by the receiver to reduce the $90,448 figure owing Joann; (4) to the extent that Ethan's portion of the community property was insufficient to discharge the obligation owed Joann, "(and the court does not anticipate it will be sufficient)," a personal money judgment in favor of Joann would be entered against Ethan for the balance.

The judgment also recites the court's findings that Ethan had made gifts and transfers of community property in fraud of Joann, and states that the personal money judgment in favor of Joann "will recite that it is bottomed on fraud and deceit ...."

The following language used by the court in finding petitioner in contempt is crucial to the issues on appeal.

"The Court finds that Charles Davidson loaned Respondent $3,000 in March, 1981, and that Charles Davidson loaned Respondent $1,500 in June, 1981, and that Respondent was free to spend the money as he pleased.

"The Court finds that from January 1981 through most of, if not all, June, 1981, Respondent had received $120 each week from unemployment insurance.

"In the Memorandum of Intended Decision and Order, which the Court has judicially notice[d], the Court ... found Respondent had earned approximately $80,000 per year before taxes in 1977, 1978 and 1979.

"The Court ... found Respondent wilfully and unjustifiably quit working to avoid his financial obligation of spousal support. The Court made its spousal support order on Respondent's ability to earn, rather than on his current earnings.

"Further ... the Court found Respondent as of the date of the Findings, April 2, 1981, still had the ability to earn $80,000 per year and had allowed his business interests to depreciate to the state where they were practically useless.

"Further ... the Court made the finding that at the time of trial, Respondent said he was sufficiently mentally and physically impaired so as to prevent him from working, that such statements were lies. The findings recited Respondent's claim of 'retirement' was a lie and the Court found Respondent was in good health and could expect ... many more years of productive, gainful employment.

"The Court finds Respondent has admitted as of June, 1981, that he had an average over the last 3 years, before his sabatical [sic] as he termed it, the sum of $69,970 per year, and the Court notes as well that in August 1981, Respondent spurned a job which had been advertised by Security Pacific Bank because the prospective salary was only in the range of $20,000 to $30,000 per year.

"The Court now finds as follows:

"Count II: The Court finds that the order of Aug. 8, 1980, requried [*sic*] Respondent to pay Petitioner on Nov. 1, 1980, spousal support of $1,500, *that on that date and at all times since that date, Respondent had the ability to pay such sum in full, and that he wilfully and intentionally failed, refused and neglected to pay such sum and that the failure to pay was wilful and contemptuous, and that he deliberately has refused to employ himself so as to be able to make such payments although he had the ability to employ himself at that time and at all times since.*" (Italics added.)

The above italicized language was repeated verbatim in each of the failure-to-pay-support counts, II through XIII.

In count XIV, the court stated: "The Court finds that the Judgment after Trial, filed April 27, 1981, required Respondent to pay to Petitioner's attorneys, Wendt, Mitchell and de la Motte attorney[']s fees in the sum of $12,000.

"The Court finds that the Memorandum of Intended Decision awarded to Respondent a gross figure of community property of a little less than $250,000 and that he has been awarded even after deducting credits, the figure of approximately $187,000. The Court notes that in the Memorandum of Intended Decision, which has been judicially noticed, the Court made a finding that Respondent mismanaged the property to deprive Petitioner of her share and the Court finds that at the time of the Judgment and at all times thereafter, Respondent has had the ability to pay the sum of $12,000, that he has failed, refused and neglected to pay such sum and that such failure to pay has been wilful and contemptuous."

██ Ethan contends that the contempt order is in excess of the court's jurisdiction because it is founded upon Ethan's capacity to earn, if he were employed, rather than his actual ability to pay, and the record contains no substantial evidence that he possessed the ability to pay at the relevant times. We agree with petitioner. Citing *Ex parte Todd, supra*, 119 Cal. 57 and *In re Brown, supra*, 136 Cal.App.2d 40, Ethan argues that the Constitution forbids imprisonment of a man or woman for failure to work, though able, to support a former spouse.

Respondent contends that, because the court found on sufficient evidence that Ethan had the *ability* to work, the *ability* to earn, and had intentionally destroyed his business as a self-employed architect, he could be held in contempt.[6]

The California cases discussing this situation are few. The leading case, *Ex parte Todd, supra*, 119 Cal. 57, was decided in 1897. In *Todd*, the petitioner was cited to show cause why he should not be punished for contempt for failing to pay permanent alimony. At the hearing, it was found that the petitioner was unemployed and had no means of paying the money. Nonetheless, the trial court found the petitioner in contempt on the ground that he had the ability to earn: "The court found, . . . that it was not in the power of the petitioner to pay the money, or any part of it. But, at the same time, the court found that petitioner, having been allowed a month or thereabouts to seek employment by which he might have earned money to make the weekly payments of alimony as prescribed in the order, had wholly failed and neglected to make any effort to obtain employment, and, therefore, ordered him to be imprisoned in the county jail until he paid the two hundred dollars due.

"*This order was clearly in excess of the power of the court, which cannot compel a man to seek employment in order to earn money to pay alimony, and punish him for his failure so to do.*" (*Id.*, at p. 58.)

*Todd* was followed in 1955 by *In re Brown, supra*, 136 Cal.App.2d 40, which also concerned the validity of a contempt sentence based upon the petitioner's failure to work to earn money to pay a support obligation. The court wrote: "There was a sufficient showing of petitioner's ability to work. If ability to work in remunerative employment was, in a pertinent legal sense, ability to comply with the mandate of the judgment, and if it had been alleged that petitioner wilfully refused to work for the express purpose of avoiding compliance with his obligations, the affidavit would have been sufficient. *But mere ability to work is not the same as ability to pay.*" (*Id.*, at p. 43; italics added.)

---

[6]Real party states: "If the only evidence presented at trial concerning ability to pay support focused on the intentional and willful failure of ETHAN A. JENNINGS, JR. to seek and obtain employment, *this author would agree that said evidence and information would not support a contempt conviction.* However, in this case we are faced with a situation where ample proof was presented . . . that MR. JENNINGS had come into possession of significant amounts of monies . . . . His intentional and willful refusal . . . to pay *any* amount of support . . . justifies the conviction on each count of contempt." (Italics added.)

Quoting from *Ex parte Todd*, the reviewing court in the *Brown* case found the contempt order in excess of jurisdiction: "Cases holding that a husband who has no money but has the ability to work may be ordered to pay support money to his wife [citation] are not in point. Also inapplicable is the rule that one may be punished for contempt if he wilfully and voluntarily puts it out of his power to comply with a court mandate. Our courts have never applied the rule to the case of a husband who has no money, but having ability to obtain employment fails or refuses to do so.

"As we have stated, the affidavit did not allege that petitioner gave up his employment voluntarily or refused to accept employment that was available. The statements relative to his future intentions were mere conclusions .... We have only the affidavit to consider and when its averments are construed strictly it appears that petitioner's disinclination to work is due to the fact that he is being supported by his present wife." (*In re Brown, supra,* 136 Cal.App.2d at pp. 43-44.)

Respondent argues that it was Ethan's burden to show inability to pay as an affirmative defense, and that, under *Brown* and *Bailey* v. *Superior Court* (1932) 215 Cal. 548 [11 P.2d 865], inability to pay is not established where the contemner "voluntarily created the disability for the purpose of avoiding such payment." (*Id.*, at p. 552.)[7] Respondent misconstrues the holding in the *Brown* opinion where it was specifically noted that the "voluntary disablement" rule has never been applied to support a conviction of contempt based upon the mere ability to earn of a spouse. (*In re Brown, supra,* 136 Cal.App.2d at p. 44.)

The *Bailey* case, which involved a contempt proceeding to enforce the petitioner's obligation to pay child support, is distinguishable; there the court upheld the contempt order, not because the petitioner had "voluntarily disabled" himself by being unemployed, but because there was substantial evidence in the record that the petitioner had assets which could be used to pay child support. (*Bailey* v. *Superior Court, supra,* 215 Cal. at pp. 553-554.)

Similarly, respondent's citation of *Dimon* v. *Dimon* (1953) 40 Cal.2d 516 [254 P.2d 528] (overruled on other grounds in *Hudson* v. *Hudson* (1959) 52 Cal.2d 735, 745 [344 P.2d 295]), is not in point. *Dimon* concerns an action to establish a former husband's obligation of support to

---

[7]See dicta in *Galland* v. *Galland* (1872) 44 Cal. 475, 478 [38 Cal.Rptr. 265].

his children and former wife. ■ Well-established case law provides that the courts may order support payments based upon the "ability to earn" as distinguished from actual income where there is a deliberate attempt on the part of a spouse to avoid family financial responsibilities by refusing to seek employment; however, these cases do not address the availability of contempt. (See *In re Marriage of Hurtienne* (1981) 126 Cal.App.3d 374, 378 [178 Cal.Rptr. 748]; *Philbin* v. *Philbin* (1971) 19 Cal.App.3d 115, 121 [96 Cal.Rptr. 408].) Ethan is not arguing here that the support order is invalid; he is contesting the propriety of the contempt order.[8] In a concurring and dissenting opinion in the *Dimon* case, Justice Traynor wrote: "In this proceeding we are not concerned with problems that might arise if the defendant should refuse to pay the amounts ordered by the trial court. Under an early decision of this court a deliberate refusal to work could not be punished by contempt (*Ex parte Todd*, 119 Cal. 57, 58 [50 P. 1071]), but ordinary judgment remedies would be available and the judgment could be satisfied if defendant should inherit or otherwise obtain property. Moreover, the threat of execution upon any subsequently acquired property [citation] might be sufficient to induce defendant to work." (*Dimon v. Dimon, supra*, 40 Cal.2d 516, 528.)

■ The trial court's finding of *contempt* upon petitioner's capacity to earn, rather than his actual ability to pay, is a departure and cannot be sustained under existing California authority. The language of *Todd* clearly implies that federal and state constitutional provisions against involuntary servitude apply.[9] (*Ex parte Todd, supra*, 119 Cal. at p. 58; 4 Markey, Cal. Family Law Practice and Procedure (rev. ed. 1982) § 50.06[2][c], p. 50-24.)

If the record showed that Ethan had the actual ability to pay, his failure to make support payments would be punishable as contempt; however, respondent fails to explain why, on this record, imprisonment

---

[8]"[T]he wife is entitled to the judgment, even though it may be impossible for the court to enforce its payment. . . ., for the debtor may thereafter acquire property . . . ." (*Messervy* v. *Messervy* (1910) 85 S.C. 189 [67 S.E. 130].)

[9]The Thirteenth Amendment to the United States Constitution provides: "Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction. [¶] Section 2. Congress shall have power to enforce this article by appropriate legislation."

A parallel provision of the California Constitution provides that "Slavery is prohibited. Involuntary servitude is prohibited except to punish crime." (Cal. Const., art. I, § 6.)

of petitioner for failure to employ himself is different from any other practice whereby, under threat of criminal sanction, an individual is compelled to work to force payment of debt. In *Pollock v. Williams* (1944) 322 U.S. 4, 18 [88 L.Ed. 1095, 1104, 64 S.Ct. 792, 799], explaining the prohibitions of the Thirteenth Amendment as implemented by the Antipeonage Act, the United States Supreme Court stated: "Whatever of social value there may be, and of course it is great, in enforcing contracts and collection of debts, Congress has put it beyond debate that no indebtedness warrants a suspension of the right to be free from compulsory service. This congressional policy means that no state can make the quitting of work any component of a crime, or make criminal sanctions available for holding unwilling persons to labor."

Here, the court believed that Ethan had succeeded in hiding assets and was doing everything in his power to avoid his obligation to Joann. At sentencing, the court stated: "You have the key to the jail house in your hands. Do you want to use it or not is up to you. I suspect you won't use it because in a sense that most of the children of the '60's would never really realize or appreciate you opted out of the system and have essentially proclaimed yourself an anarchist or an outlaw and for reasons I suppose only known to yourself. I would suspect it is the hatred of your wife which has caused you to collapse the entire structure of your life rather than comply with your duties under the laws as a husband and as a partner owing her fiduciary obligations concerning her property.

"You have done your best to steal everything she has and you have largely succeeded. You have proved again, I believe, that if a person really wants to defy the court, disobey its restraining orders, you can likely do so. The court, however, essentially will have its opportunity to impose its punishment, but even at this stage, Mr. Jennings, you still have an opportunity to get right by the world and convince me that I should release you from some portion of the incarceration which I have today imposed.

"But it's going to take, in order for you to convince me of that, a fairly strong dose of money administered to your wife before I will exercise the rights inherent in this one-day suspension in each count to relieve you of serving the balance."

As far as the record shows, however, Ethan was totally without assets; the receiver took possession of the property awarded Ethan,

including the business property, and sold it to pay Joann as ordered by the court. To the extent the contempt order was based upon Ethan's failure to work, it cannot be sustained. (*Ex parte Todd, supra*, 119 Cal. 57; 2 Cal. Family Lawyer, *supra*, § 30.87, p. 1445.)

■ Joann argues that there was substantial evidence to support a finding that Ethan was able to pay *some* amount of support, and therefore the contempt order is sustainable. As explained in 4 Markey, *supra*, page 50-24, "... if the obligated party is not wholly unable to make payments, he or she should pay whatever portion of the court-ordered sum he or she is able to pay. A reduced ability to pay pursuant to the existing order does not excuse disobedience except to the extent of failure to pay that portion of the court-ordered sum which has become beyond the obligated party's means." (Fn. omitted; see *Lyon* v. *Superior Court* (1968) 68 Cal.2d 446, 450 [67 Cal.Rptr. 265, 439 P.2d 1]; *Hoerner* v. *Superior Court* (1960) 182 Cal.App.2d 500, 505-506 [6 Cal.Rptr. 178].)

However, this argument fails because the court made no specific finding that Ethan was able to pay any lesser amount. In the *Lyon* case, the court cited and distinguished cases in which a contempt sentence was set aside for lack of a definite and certain finding of the amount the contemner was able to pay. (*Lyon* v. *Superior Court, supra*, 68 Cal.2d at p. 450.) In *Lyon*, the order was upheld because it recited that the petitioner was able to pay at least the specific amount of $75 on each of six particular dates. (*Id.*, at pp. 450-451; see *In re Spollino* (1962) 208 Cal.App.2d 783 [25 Cal.Rptr. 536], in which a finding of "'*partial ability* to comply with [the] order'" was held void as too uncertain.)

Joann has not argued that Ethan failed to sustain his burden of showing inability to pay the full amount of support for those months following March 1981 when he received two loans from a friend. The court might have disbelieved Ethan's testimony that he spent the sums for room and board and there was no evidence *when* the money was spent. Such an argument is now waived. Joann concedes that the record contains no substantial evidence to sustain the court's finding that Ethan had the ability to pay the total amount.

The wording of the court's findings clearly shows that the judge did not rely upon evidence of any particular amounts of money Ethan received to convict him on each count of contempt. The only evidence of

actual income received by Ethan prior to March 1981 was the payment of unemployment insurance starting in January 1981. Nevertheless, the language in each count is identical, stating that Ethan "deliberately has refused to employ himself so as to be able to make such payments although he had the ability to employ himself at that time and at all times since." The court's findings obviously were based on Ethan's earning capacity, not on evidence of any actual income.

Finally, Ethan contends that the record contains no substantial evidence that he had the ability to pay $12,000 in attorney's fees, subject of the contempt order in count XIV. Again, it appears that the assets of the business and the bulk of Ethan's personal property were sold and that the proceeds from the sale were less than the amount the court ordered to be paid to Joann in the April 1981 judgment. Joann conceded below that Ethan had no remaining property to be attached or executed upon, and attributed this fact to his deviousness. However, the record presents only Ethan's testimony that he had no assets and owed substantial sums of money, including taxes.

We note that the Legislature has not made Ethan's failure to work to support a *former* spouse a crime[10] and, reviewing this record under California case law, we are bound by the holding in *Ex parte Todd, supra*, 119 Cal. 57 that contempt may not be applied to incarcerate Ethan because he is unemployed.

The writ is granted; the judgment of contempt is set aside as to counts II through XIV.

Brown (G. A.), P. J., and Zenovich, J., concurred.

---

[10]See California Penal Code section 270a making the refusal to provide support for a spouse a misdemeanor.